## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

ANDREW V. KOCHERA, JR., v.     No. 3:14-cv-00029-SMY-SCW
FOSTER WHEELER, LLC, ET AL.,

GERALD D. MCALVEY v. ATLAS     No. 3:14-cv-00064-SMY-SCW
COPCO COMPRESSORS, LLC, ET AL.,
KENNETH R. GREENLEAF V. ATLAS     No. 3:14-cv-00051-SMY-SCW
COPCO COMPRESSORS, LLC, ET AL.,

CHARLES N. NEUREUTHER V. ATLAS     No. 3:13-cv-01327-SMY-SCW
COPCO COMPRESSORS, LLC, ET AL.,
RICHARD W. BELL V. ABB GROUP,     No. 3:13-cv-01338-SMY-SCW
INC., ET AL.

– – – – – – – – – – /

DEPOSITION OF:  DR. MATTHEW A. VUSKOVICH
DATE:        October 27, 2014
TIME:        9:10 a.m. to 5:29 p.m.
PLACE:       Holiday Inn
             700 North Westshore Boulevard
             Tampa, Florida
BEFORE:      MARGARET A. BARLOW, RMR
             Notary Public, State of
             Florida at Large

## Page 2

1   APPEARANCES:
2
3   Mr. Ben A. Vinson, Jr., of Vinson Law Office, 4230
    S. MacDill Ave, Suite 203, Tampa, FL 33611, represented
4   Plaintiffs
5
6   Mr. Daniel J. Mulholland of Forman, Perry, Watkins,
    Krutz & Tardy, LLP, 200 S. Lamar Street, Suite 100,
7   Jackson, MS 39201, represented CBS Westinghouse and GE
8
9   Attended Telephonically:  Mr. Michael Schroer of
    HeplerBroom, LLC, 130 North Main Street, PO Box 510,
10  Edwardsville, IL 62025, represented Crane Co., for all
    plaintiffs, and Georgia-Pacific LLC f/k/a
11  Georgia-Pacific Corporation in the McAlvey and
    Neureuther cases
12
13
14  Attended Telephonically:  Mr. Gary Smith of Herzog
    Crebs, LLP, 100 North Broadway, 14th Floor, St. Louis,
    MO 63102, represented Johnson Controls Inc., in the
15  McAlvey case
16
17  Attended Telephonically:  Mr. Keith Hill of Heyl,
    Royster, Voelker & Allen, 105 West Vandalia, Suite 100,
18  Edwardsville, IL 62025, represented Air & Liquid Systems
    Corporation, successor by merger to Buffalo Pumps, Inc.,
19  incorrectly named herein as Buffalo Pumps, Inc., Imo
    Industries Inc., Warren Pumps, LLC
20
21
22  Attended Telephonically:  Ms. Nicole E. Rice of Hinshaw
    & Culbertson, LLP, 521 West Main Street, Suite 300,
    Belleville, IL 62222, represented Electrolux Home
23  Products Inc.
24

## Page 3

1   Attended Telephonically:  Mr. Kyler Stevens of Kurowski
    Shultz, LLC, 228 West Pointe Drive, Swansea, IL 62226,
2   represented Carrier Corporation, in the McAlvey case
3
4   Attended Telephonically:  Mr. Matthew J. Morris of
    Lewis, Brisbois, Bisgaard & Smith, LLP, 103 West
5   Vandalia Street, Mark Twain Plaza 2, Suite 300,
    Edwardsville, IL 62025, represented Union Carbide
6   Corporation, in the McAlvey and Neureuther case
7
8   Attended Telephonically:  Mr. Undray Wilks of
    McGuireWoods, LLP, 77 West Wacker Drive, Suite 4100,
9   Chicago, IL 60601 represented ITT Corporation
10
11  Attended Telephonically:  Mr. Sean Fergus of O'Connell,
    Tivin, Miller & Burns, LLC, 135 South LaSalle Street,
12  Suite 2300, Chicago, IL 60603, represented John Crane,
    Inc., in the McAlvey case
13
14
15  Attended Telephonically:  Ms. Kathleen A. Hardee of
    Polsinelli, PC, 900 W. 48th Place, Suite 900, Kansas
    City, MO 64112, represented Honeywell in the McAlvey
16  case
17
18  Attended Telephonically:  Mr. Brian O'Connor Watson of
    Schiff Hardin, LLP, 233 South Wacker Drive, Suite 6600,
19  Chicago, IL 60606, represented Owens-Illinois, Inc.
20
21  Mr. John A. LaBoon of Segal, McCambridge, Singer &
    Mahoney, Ltd., 100 Congress Avenue, Suite 800, Austin,
22  TX 78701, represented Dravo and Foster Wheeler
23
24

## Page 4

1                       INDEX
2   DIRECT EXAMINATION BY MR. MULHOLLAND            6
3   DIRECT EXAMINATION BY MR. LaBOON               65
4   DIRECT EXAMINATION BY MR. SCHROER              99
5   DIRECT EXAMINATION BY MR. FERGUS              125
6   DIRECT EXAMINATION BY MR. STEVENS             152
7   FURTHER DIRECT EXAMINATION BY MR. MULHOLLAND  158
8   FURTHER DIRECT EXAMINATION BY MR. LaBOON      172
9   FURTHER DIRECT EXAMINATION BY MR. SCHROER     185
10  FURTHER DIRECT EXAMINATION BY MR. FERGUS      200
11  FURTHER DIRECT EXAMINATION BY MR. LaBOON      210
12  FURTHER DIRECT EXAMINATION BY MR. SCHROER     219
13  FURTHER DIRECT EXAMINATION BY MR. FERGUS      235
14  FURTHER DIRECT EXAMINATION BY MR. LaBOON      240
15  FURTHER DIRECT EXAMINATION BY MR. SCHROER     253
16  FURTHER DIRECT EXAMINATION BY MR. FERGUS      267
17  FURTHER DIRECT EXAMINATION BY MR. LaBOON      271
18  FURTHER DIRECT EXAMINATION BY MR. SCHROER     288
19  FURTHER DIRECT EXAMINATION BY MR. FERGUS      295
20  FURTHER DIRECT EXAMINATION BY MR. LaBOON      298
21  FURTHER DIRECT EXAMINATION BY MR. STEVENS     299
22  FURTHER DIRECT EXAMINATION BY MR. FERGUS      300
23  FURTHER DIRECT EXAMINATION BY MR. LaBOON      302
24

Page 5

1    FURTHER DIRECT EXAMINATION BY MR. SCHROER       307
2    FURTHER DIRECT EXAMINATION BY MR. FERGUS        312
3    FURTHER DIRECT EXAMINATION BY MR. LaBOON        318
4    CROSS-EXAMINATION BY MR. VINSON                 320
5    REDIRECT EXAMINATION BY MR. LaBOON              346
6    REDIRECT EXAMINATION BY MR. FERGUS              349
7    RECROSS-EXAMINATION BY MR. VINSON               354
8    CERTIFICATE OF OATH                        358
9    REPORTER'S CERTIFICATE                     359
10   ERRATA SHEET                          360
11

12
                    EXHIBITS
13
                 ID'd  MARKED
14   NO.
     1   Amended Notice of Deposition      46   46
15   2   Curriculum Vitae                  46   46
     3   Articles                          71   124
16

17

18                CERTIFIED QUESTIONS
19                Page 350, Line 22
20

21

22

23

24

Page 6

1              DR. MATTHEW A. VUSKOVICH,
2    the witness herein, being first duly sworn on oath, was
3    examined and deposed as follows:
4         THE WITNESS:  Yes, ma'am.
5                DIRECT EXAMINATION
6    BY MR. MULHOLLAND:
7         Q   Doctor, could you state your name for the
8    record, please?
9         A   Matthew Vuskovich.
10        Q   You've been deposed many times --
11             MR. FERGUS:  Counsel, before we start -- go on
12        the record.  Before we start, can we have an
13        agreement that objection by one will be an objection
14        for all, for the purposes of preserving objections
15        for this deposition?
16             MR. VINSON:  Yes.
17             MR. FERGUS:  Then also -- again, this is Sean
18        Fergus -- on Friday, I again sent out a request for
19        the doctor's reliance materials.  I still have not
20        seen all of the x-rays that the doctor relied upon
21        to form his opinions, and I'm reserving my right to
22        reopen this discovery deposition following my
23        receipt of those documents, and the films that I
24        requested on numerous occasions prior to the

Page 7

1    commencement of this deposition.
2             MR. MULHOLLAND:  Anything else?
3             MR. FERGUS:  Nope.  That's it.
4    BY MR. MULHOLLAND:
5         Q   All right.  Doctor, my name is Danny
6    Mulholland.  I'm going to be asking you some questions
7    today.
8             As I understand it, you've been deposed many
9    times, right?
10        A   Yes.  Yes, sir.
11        Q   In 1969, you were in medical school at LSU,
12   right?
13        A   Yes, sir.
14        Q   Did you graduate?
15        A   Yes, sir.
16        Q   Did you do an internship?
17        A   Yes, sir.
18        Q   Where did you do an internship?
19        A   Ochsner Foundation Hospital.
20        Q   Did you do a fellowship?
21        A   No.  I did one year of orthopedic surgery.
22        Q   And then you quit; is that right?
23        A   Yeah.
24        Q   As I understand it, you quit because you needed

Page 8

1    to make more money and support your family; is that
2    right?
3         A   Yes, sir.
4         Q   And after that one year of residency, you did
5    occupational and hyperbaric medicine in the Gulf of
6    Mexico; is that right?
7         A   Yes, sir.
8         Q   You worked with diving companies and oil
9    companies?
10        A   Yes, sir.
11        Q   You conducted employee physicals at oil
12   companies?
13        A   Yes, sir.
14        Q   During this time that you were -- following
15   your one year of -- when you were doing this work for
16   the oil companies, you have not seen much silica or
17   asbestos grainings or any diseases associated with those
18   in your work; is that right?
19        A   No, sir.
20        Q   That's a correct statement?
21        A   That's correct.  The statement is correct.
22        Q   I see you looking intently at your computer
23   screen.  Is there something that you're referring to as
24   you testify?

Page 9

1     **A   No, sir.**
2     Q   May I see it?
3     **A   Sure.**
4     Q   Okay. All right. In your view, in the 1970s,
5 nobody thought asbestos and silica was a hazard; is that
6 right?
7     **A   Not an industry.**
8     Q   In 1977, you moved to Kentucky and began
9 working in the emergency medicine field at multiple
10 hospitals; is that right?
11     **A   Yes, sir.**
12     Q   And between '80 and '85, you started a family
13 occupational medicine practice; is that right?
14     **A   Yes, sir.**
15     Q   And during that time, you've primarily
16 conducted preemployment physicals for Train and James
17 River and evaluated on-the-job injuries and occupational
18 injuries; is that right?
19     **A   I also worked in the coal mining industry, did**
20 **evaluations for coal workers, pneumoconiosis folks in**
21 **the state of Kentucky and for plaintiff and defense**
22 **attorneys.**
23     Q   All right. And that was -- that started in
24 1986; is that right?

Page 10

1     **A   Yes, sir.**
2     Q   But between '80 and '85, you were doing
3 preemployment physicals and --
4     **A   I did -- I did preemployment physicals, yes,**
5 **sir.**
6     Q   I'm going to try to not interrupt you when
7 you're giving your answer, and I'm going to ask you if
8 you would not interrupt me when I'm asking my question,
9 because at the end of the day, it's all going to go much
10 more smoothly if we do it that way.
11     **A   Sure.**
12     Q   Now, beginning in 1986, you started some black
13 lung work; is that right?
14     **A   Yes, sir.**
15     Q   And when you started doing the black lung work,
16 you were not a B reader, correct?
17     **A   No, sir.**
18     Q   When did you first take the B reader exam?
19     **A   Let's see. The first one I took was in -- I**
20 **don't know for certain. I can't remember. I took half**
21 **of one in '88, because I was late for the test. And**
22 **then I took one and failed in '89, and then I passed in**
23 **1990.**
24     Q   Now, have you recertified every four years

Page 11

1 since 1990?
2     **A   Yes, sir.**
3     Q   Have you failed the test again since 1989?
4     **A   No, sir.**
5     Q   Are you certified now?
6     **A   Yes, sir.**
7     Q   And when was the last time you certified?
8     **A   My B reader document expires in 2018.**
9     Q   Okay. And as I understand it, when you were
10 doing B reader work for the black lung evaluations, you
11 were finding about 20 percent positives; is that right?
12     **A   Yes, sir.**
13     Q   Were you working for plaintiffs' lawyers or
14 defense lawyers at that time?
15     MR. VINSON: Objection, asked and answered.
16     **A   Mostly -- mostly defense, some plaintiff.**
17 BY MR. MULHOLLAND:
18     Q   All right. By and large, most of your work was
19 for defense lawyers at that time?
20     **A   The evaluations were for defense lawyers, but I**
21 **read the x-rays about half and half, and I did a lot of**
22 **work for the State of Kentucky, too. You know, you**
23 **could read x-rays as well as do evaluations.**
24     Q   And throughout that period, your positive rate

Page 12

1 was about 20 percent; is that right?
2     **A   Yes, sir.**
3     Q   Now, your first contact with asbestos was doing
4 surveillance work of asbestos abatement workers in the
5 late '80s; is that right?
6     **A   Yes, sir.**
7     Q   You're not a radiologist, correct?
8     **A   No, sir.**
9     Q   And you're not a pulmonologist?
10     **A   No, sir.**
11     Q   You're board certified in occupational
12 medicine; is that right?
13     **A   Yes, sir.**
14     Q   Do you know any other B readers who are board
15 certified in occupational medicine?
16     **A   I don't know anyone.**
17     Q   Now, back in the 1980s, late '80s time frame,
18 when you were doing black lung evaluations, as I
19 understand it, you were reviewing, what, 2,000, 2,500
20 black lung cases per year; is that right?
21     **A   I did approximately five a day, so five times**
22 **five is 25. So about a 100 a month evaluate -- 100 a**
23 **month evaluations, and then I read substantial number**
24 **more x-rays.**

Page 13

1    Q   You've testified in the past that you've done
2  about 2,000 to 2,500 black lung cases per year during
3  that period.  Do you still think that's an accurate
4  estimate?
5    A   That's accurate.
6    Q   Now, in 1998, you went to the University of
7  South Florida and began work on your occupational --
8  your master's of science in public health; is that
9  right?
10   A   Yes.  That was part of the occupational
11 medicine residency program.
12   Q   All right.  When did you finish the
13 occupational residency program --
14   A   In the year --
15   Q   -- occupational medicine residency program?
16   A   The year 2000.
17   Q   Did you get board certified?
18   A   Yes, sir.
19   Q   What year?
20   A   2002.
21   Q   And I understand at that time you started
22 something called COMBI clinic and that's K-O-M-B-I
23 [sic]; is that right?
24   A   I worked for that organization.  It wasn't my

Page 14

1  organization.
2    Q   And you were doing physicals and on-the-job
3  injury evaluations and asbestos and other occupational
4  pulmonary disease surveillance; is that right?
5    A   Yes, sir.  As a B reader, I read the x-rays of
6  pneumoconiosis for the clinic.
7    Q   Would it be fair to say that you saw thousands
8  of workers' records or examined thousands of workers'
9  records at that time?
10   A   Over a period of two years.
11   Q   And you found no one during that period who had
12 asbestosis; is that right?
13   A   That's right.
14   Q   Now, in 2002, you started a company called
15 O-c-c Options; is that right?
16   A   Yes, sir.
17   Q   How did -- how do you say "O-c-c Options"?
18   A   OccOptions.
19   Q   At that time, you started doing black lung work
20 again; is that right?
21   A   I did black lung.  That was part of what I did.
22   Q   And you also did medical necessity review for
23 workers' comp insurance; is that right?
24   A   Yes, sir.

Page 15

1    Q   And you did that from 2002 to roughly 2006,
2  right?
3    A   I did the medical necessity work.
4    Q   Right.
5    A   But I continued to do black lung work, which I
6  continue to do now, and asbestos.
7    Q   Now, in 2006, you first started doing asbestos
8  B reads for plaintiffs' lawyers; is that right?
9    A   Yes, sir.
10   Q   And your first client was Danny O'Shea?
11   A   Yes, sir.
12   Q   Do you still work for Mr. O'Shea?
13   A   Yes, sir.
14   Q   Do you work for any defense lawyers in the
15 asbestos arena?
16   A   No, sir.
17   Q   You do, however, do work for defense lawyers in
18 the black lung arena, correct?
19   A   Yes, sir.
20   Q   Now, is Mr. O'Shea your largest asbestos
21 client?
22   A   Yes, sir.
23   Q   Who are your top five largest plaintiffs'
24 lawyer asbestos clients?

Page 16

1    A   Danny O'Shea and Ben Vinson.
2    Q   Those are your only two clients?
3    A   Yes, sir.
4    Q   Are you still operating OccOptions?
5    A   Yes, sir.
6    Q   Is that your company?
7    A   Yes, sir.
8    Q   Is all of your income derived from the
9  medicolegal field?
10   A   Yes, sir.
11   Q   And in the medicolegal field, you do black lung
12 work and asbestos work.  Do you do any other kinds of
13 work?
14   A   I -- I do some medical necessity work for
15 attorneys in Kentucky, defense attorneys.
16   Q   Okay.  What is --
17   A   Not medical necessity, treatment.  Mostly
18 treatment.
19   Q   All right.  What is -- describe for me what
20 that is, please.
21   A   Well, if a person has an order from a judge,
22 and the judge determined that the person had a certain
23 condition with a certain degree of disability, and the
24 treating physicians start treating him for something

Page 21

1  periods of time that you were in Kentucky and Florida
2  has been black lung work?
3      A   Yes, sir.
4      Q   Now, during your three years at South
5  Florida -- which three years were those?  '98 through
6  2001; is that right?
7      A   Yeah.  I started the program in 1998, and I
8  finished the program in 2000, and I continued to work
9  there part time.  And I worked for COMBI during that
10 time, too, full time at COMBI.
11     Q   During that period of time, '98, 2000, 2001,
12 your primary focus was RADS; is that right?
13     A   Lead -- the chief of our program was the father
14 of that concept of RADS, and so we did a lot of
15 evaluations for RADS.  But we did evaluations for other
16 pulmonary diseases as well, including asbestosis.
17     Q   What is RADS?
18     A   It's called reactive airways dysfunction
19 syndrome.
20     Q   What does that result from?
21     A   Acute exposures to pulmonary toxins, usually
22 gas or fume.
23     Q   Now, you didn't do your first asbestos
24 deposition until 2011; is that right?

Page 22

1      A   I don't know for certain, but it's probably --
2  that's probably right.  I mean, you have the information
3  there.
4      Q   But you did three or four -- and you continue
5  to do three or four black lung depositions per month; is
6  that right?
7      A   No, I -- I hardly ever do black lung
8  depositions anymore.
9      Q   When did that stop?
10     A   Oh, I guess a couple of years ago, two years
11 ago.
12     Q   Why did that stop?
13     A   Well, I -- my -- my work in black lung has been
14 mostly with reviewing and validating pulmonary function
15 test results, which doesn't really require that many
16 depositions.
17     Q   Have you published anything in the medical
18 literature on the topic of asbestos or asbestos-related
19 disease?
20     A   No, sir.
21     Q   Have you published anything at all in your
22 field of medicine?
23     A   Just we published an article in the -- to
24 complete the -- the master of science in public health,

Page 23

1  we have to publish a journal article, which I did.
2      Q   What was your journal article about?
3      A   It was a measurement article about how to use
4  questionnaires as a surrogate for actual exposure to
5  pulmonary irritants.
6      Q   What was the conclusion, if any, of your
7  article?
8      A   For certain things, the questionnaire was an
9  effective -- fairly effective surrogate, but other
10 things it was not.
11     Q   What was it not an effective surrogate for?
12     A   If I can recall, it wasn't an effective
13 surrogate for like carbon monoxide, you know, or gases
14 that were nonirritant-type gases.
15     Q   It would also not be a surrogate -- excuse me.
16 The questionnaire would also not be a surrogate for
17 purposes of diagnosis of disease; is that right?
18         MR. VINSON:  Objection.
19     A   No.  That's not a -- it wasn't a -- it was a
20 measurement, to measure something, to measure exposure.
21 BY MR. MULHOLLAND:
22     Q   So my statement would have been right; is that
23 correct?
24     A   Yes.

Page 24

1          MR. VINSON:  Same objection.
2  BY MR. MULHOLLAND:
3      Q   Now, you've been asked in the past about
4  whether you're aware of the accusations against B
5  readers on the senate hearings which subsequently --
6  accusations against B readers out of Texas or the United
7  States Senate hearings, which subsequently occurred
8  where certain B readers took the Fifth Amendment, and
9  you indicated that you were not aware of those.
10         My question is, since that time, have you
11 become aware of those?
12     A   No, sir.
13     Q   You didn't know Dr. Ray Harron?
14     A   No.
15     Q   Dr. James Ballard?
16     A   James -- no.
17     Q   Are you familiar with NIOSH?
18     A   Yes, sir.
19     Q   What is NIOSH?
20     A   NIOSH is the research arm of OSHA.  It was
21 written into the OSHA law that created NIOSH, National
22 Institute For Occupational Safety and Health.  It's --
23 instead of being in the Department of Labor, the NIOSH
24 is under the Department of Health and Human Services.

6  (Pages 21 to 24)

Page 25

1    Q   What is the role of NIOSH with respect to the
2    B reader program?
3    A   **Administers the B reader program, because the**
4    **role of NIOSH is epidemiologic research and**
5    **recommendations from their research.**
6    Q   What is the role of NIOSH with respect to the
7    field more broadly of, say, occupational medicine?
8    A   **NIOSH is involved in surveillance, screening,**
9    **and epidemiologic studies of certain populations that**
10   **are exposed to certain -- certain diseases.  My**
11   **residency program was sponsored by NIOSH.**
12   Q   Would it be fair to say that you're intimately
13   familiar with NIOSH as a result of your occupation and
14   your training?
15   A   **I don't know what you mean by "intimately."**
16       MR. VINSON:  I'm going to object to that.
17       THE WITNESS:  You have to tell me more about
18       that.  What do you mean by "intimately"?
19   BY MR. MULHOLLAND:
20   Q   Fair enough.  Do you keep abreast of the
21   affairs at NIOSH?
22   A   **Affairs?**
23       MR. VINSON:  Same objection.
24       THE WITNESS:  I don't know -- I don't have -- I

Page 26

1    don't know about any affairs.
2    BY MR. MULHOLLAND:
3    Q   Okay.  We'll get more particular in a minute.
4        Now, when films are sent to you by attorneys
5    for asbestos readings, I believe you indicated in your
6    previous testimony that you find approximately 80
7    percent of those to be positive; is that correct?
8        MR. VINSON:  Objection.
9    A   **All depends who sent them.**
10   BY MR. MULHOLLAND:
11   Q   All right.  Well, let's say Mr. O'Shea.  Eighty
12   percent of those are positive?
13   A   **Usually.**
14   Q   Mr. Vinson, 80 percent of those are positive?
15   A   **Yes, sir.**
16   Q   Mr. Gavin, 80 percent of those are positive?
17   A   **I haven't seen any of Mr. Gavin's in a long**
18   **time.  I don't know.  Probably.  Probably when he did**
19   **send, the few that he sent.**
20   Q   Okay.  So --
21   A   **Eighty percent would be -- that's a reasonable**
22   **number.**
23   Q   And Jones & Granger, 80 percent of those?
24   A   **Yes, sir.**

Page 27

1    Q   Is there anybody that 80 percent -- any of the
2    plaintiffs' lawyers that have sent you asbestos or --
3    excuse me.  Are any of the plaintiffs' lawyers who have
4    sent you x-rays for asbestos readings that you did not
5    read 80 percent for?
6    A   **No.**
7    Q   Now, in 2011, you indicated that since you
8    started looking at medicolegal records for asbestos, you
9    saw -- you had seen approximately 6,000 x-rays; is that
10   right?
11   A   **Six thousand?  Probably so.  I really -- that's**
12   **a good number.**
13   Q   Since then, how many additional x-rays do you
14   think you've seen?
15   A   **Since -- what was the date you said?**
16   Q   2011, so it would be '12, '13 and most of '14.
17   A   **Three or four thousand, because I don't do work**
18   **for certain other lawyers, you know.  I used to see a**
19   **lot for Jones Granger, but obviously I don't do that**
20   **work anymore.**
21   Q   So if my math is right and your estimates are
22   right, that means you've seen 9- or 10,000 x-rays for
23   purposes of asbestos evaluations; is that right?
24   A   **That's reasonable.**

Page 28

1    Q   And of those, you found about 80 percent to be
2    positive, right?
3    A   **Yes, sir.  I would like to clarify that.**
4    Q   Okay.
5    A   **I mean, that's the ones that plaintiffs'**
6    **attorneys sent me, 80 percent positive.  But I read a**
7    **lot of other x-rays that are negative for asbestos, but**
8    **that's basically for clinics that are screening for**
9    **asbestos exposure.  And by and large, those are all**
10   **negative, like we had talked about before.**
11   Q   Right.
12   A   **So if you lump them all together, you know, you**
13   **lump the ones from the clinic and from the other ones,**
14   **you would have a less -- less percentage, but you would**
15   **have to throw out the ones from the clinics, because**
16   **they don't have any latency period.  They're not going**
17   **to be positive.**
18   Q   But if we unlump them and just look at the
19   ones -- the 9- or 10,000 that you looked at for asbestos
20   lawyers, 80 percent of those are positive?
21   A   **Yes, sir.**
22       MR. VINSON:  Objection, asked and answered.
23       Do you want to take five?
24       MR. MULHOLLAND:  No, I would rather keep going.

Page 29

1    MR. VINSON: Okay. Go ahead.
2    BY MR. MULHOLLAND:
3    Q   Describe for me in general the process by which
4    you are engaged by plaintiffs' lawyers to undertake
5    evaluations of x-rays for asbestos cases.
6        MR. VINSON: Objection, form.
7    **A  I don't understand the question.**
8    BY MR. MULHOLLAND:
9    Q   All right. How do you get your business from
10   plaintiffs' lawyers in these asbestos x-ray readings?
11       MR. VINSON: Same objection.
12   **A  They see my name on the NIOSH website; they**
13   **contact me.**
14   BY MR. MULHOLLAND:
15   Q   How are the x-rays transmitted to you?
16   **A  Through mail.**
17   Q   Usually with a letter or no?
18   **A  Usually with a letter.**
19   Q   What type of information is in the letter?
20   **A  The patient exposure, who was exposed to**
21   **asbestos, a steel worker or something.**
22   Q   Are you given any other information?
23   **A  No.**
24   Q   And do you nowadays receive an x-ray film or a

Page 30

1    disk with an x-ray on it, or how does that work?
2    **A  Now it's 90 percent disk.**
3    Q   And so do you get those -- do you get a letter
4    with a disk, or do you get an e-mail with a file
5    attached, or how does that work?
6    **A  Just the disk comes in the mail.**
7    Q   With a letter?
8    **A  Yeah, typically.**
9    Q   All right. Is that how Mr. O'Shea transmits
10   x-rays to you?
11   **A  Yes, sir.**
12   Q   Is that how Mr. Quinn or Mr. Vinson transfers
13   x-rays to you?
14   **A  Yes, sir.**
15   Q   The same would be true of Gavin? Of course he
16   doesn't send you anymore. Back when he sent them to
17   you, that's the way he sent them to you, right?
18       MR. VINSON: Objection, argumentative.
19   **A  Yes, sir.**
20   BY MR. MULHOLLAND:
21   Q   And who's the lawyer at Jones & Granger that
22   you dealt with?
23   **A  It was -- most of it was Bruce Halstead,**
24   **Halstead.**

Page 31

1    Q   And when -- when you receive x-rays with a
2    cover letter, are you provided any other information?
3        MR. VINSON: Objection, asked and answered.
4    **A  No.**
5    BY MR. MULHOLLAND:
6    Q   And you're asked to do a B read, right?
7    **A  Yes, sir.**
8    Q   Are you asked to do anything else?
9    **A  No.**
10   Q   How do you go about preparing your B reads?
11   **A  I B read by comparing the x-ray to a standard.**
12   Q   Put the x-ray up on a view box along with the
13   standard?
14   **A  Yes, sir.**
15   Q   And you reach your conclusions about that
16   x-ray?
17   **A  Yes, sir.**
18   Q   And how do you memorialize those conclusions?
19   **A  I fill out an ILO form.**
20   Q   Do you do that yourself?
21   **A  Yes, sir.**
22   Q   Do you make notes and then fill out the ILO
23   form, or do you just fill out the ILO form directly?
24   **A  Fill out directly.**

Page 32

1    Q   And do you fill that out by hand --
2    **A  Yes, sir.**
3    Q   -- or by computer?
4    **A  By hand.**
5    Q   All right. And once you've done those ILO
6    readings, what do you do with them?
7    **A  Send them to the attorney.**
8    Q   And if you're asked to -- and do you send a
9    bill with those?
10   **A  Yes, sir.**
11   Q   Are you ever then asked to do a medical report
12   on any of those people for whom you've read their x-ray?
13   **A  Yes, sir.**
14   Q   And how does that come about?
15   **A  Scheduling the evaluation.**
16   Q   How is it communicated to you that you need to
17   do -- or that you are to do a medical report on these
18   people?
19   **A  A phone call and see if we can schedule an**
20   **evaluation.**
21   Q   Who calls you? Does the attorney call you?
22   The paralegal call you? Who calls you?
23   **A  The secretary.**
24   Q   Do you ever do medical reports on people for

Page 33

1    whom you concluded that their x-ray was negative?
2        A   No.
3        Q   Where do you do examinations?
4        A   I've done them at my house, and I've done them
5    in motel rooms or a meeting room in a hotel, a motel.
6        Q   Where have you done examinations for
7    Mr. Vinson?
8        A   At my home, when I lived here in Tampa.
9        Q   You no longer live in Tampa?
10       A   No.
11       Q   Where do you live now?
12       A   I live in Gainesville, Kentucky.  Gainesville,
13   Florida, I'm sorry.
14       Q   Do you do examinations at your home in
15   Gainesville, Florida?
16       A   I've done one or two.
17       Q   Do you ever do pulmonary function testing as
18   part of your examination?
19       A   No.
20       Q   Okay.  Let's suppose that you're retained to do
21   an examination on Mr. X, and Mr. X comes to your house,
22   excuse me, and you do that examination.  What would your
23   typical examination entail?
24       A   A history, including an occupational history

Page 34

1    and smoking history, a history of other pulmonary
2    diseases at present.  Symptoms, document symptoms.  Then
3    a physical examination with emphasis on the lungs,
4    basically using my stethoscope and looking, listening to
5    his lungs and examining the chest wall and see if he has
6    any type of serious evidence of any serious
7    abnormalities of the chest wall.  That's it.
8        Q   Do you look for clubbing?
9            TELEPHONIC DEFENSE COUNSEL:  Sorry to
10       interrupt, but it would be really helpful if the
11       witness could speak up a little bit.  It's hard to
12       hear on the phone.  Thanks.
13           THE WITNESS:  Yes, sir.  Clubbing -- yes, sir.
14       Clubbing, I look for clubbing.
15   BY MR. MULHOLLAND:
16       Q   And your examination of the chest wall,
17   that's -- that's -- you do an external examination of a
18   person's chest wall, right?
19       A   Just looking.
20       Q   Right.  Do you make notes of your examination?
21       A   On the computer.
22       Q   You don't make handwritten notes?
23       A   No.
24           MR. VINSON:  Objection, asked and answered.

Page 35

1    BY MR. MULHOLLAND:
2        Q   And then what happens?
3        A   Send the report in, send the bill.
4        Q   How does the report get written?
5        A   What is that?
6        Q   How does the report get written?  Do you write
7    it?
8        A   Yes.  Yes, I write the report.
9        Q   Do you actually do the typing?
10       A   Yes, sir.
11       Q   Do you have a template that you use?
12       A   Yes, sir.
13       Q   And that's the same for every case?
14       A   Yes, sir.
15       Q   When you do letters for -- excuse me, let me
16   start over.
17           When you do B readings for asbestos, you know
18   before you read the film that the person whose film
19   you're reading allegedly has had asbestos exposure,
20   correct?
21       A   Yes, sir.
22       Q   Would you prefer to read the x-rays blind, that
23   is, not knowing anything about the patient or what that
24   patient may or may not have been exposed to?

Page 36

1        A   Makes no difference.
2        Q   But, in any event, when you get a film to look
3    at from plaintiffs' lawyers, you're under the assumption
4    that the person has had exposure to asbestos because
5    they wouldn't have sent the film to you in the first
6    place; is that right?
7        A   That's right.
8        Q   You also know how old the person is, too,
9    because the date of birth is reflected on the x-ray,
10   right?
11       A   Yes, sir.
12       Q   And that's -- exposure and the date of birth,
13   that's something that you know before you ever do the
14   B read, right?
15       A   That's correct.
16           THE WITNESS:  I'm going to get a little bit of
17       water here.
18   BY MR. MULHOLLAND:
19       Q   Do you think the fact that you know the
20   individual's exposure and also know the individual's
21   birth date, that those facts and your knowledge of them
22   create any bias in you in terms of your B readings for
23   asbestos?
24       A   No.

9  (Pages 33 to 36)

Page 41

```
1      Q   -- what information would you have about Mr. X?
2      A   His name, his age, and what his occupation is,
3    typically.
4      Q   And how would that occupation information be
5    communicated to you?
6      A   Typically by phone.
7      Q   By whom?
8      A   By the attorney, Ben or one of the attorneys'
9    surrogates, like a secretary or something like that.
10     Q   And then you would meet Mr. X at your home, for
11   example, for his examination, right?
12     A   Yes, sir.
13     Q   And you would take -- or excuse me.  You would
14   elicit from Mr. X some information and ultimately
15   prepare your report, correct?
16     A   Yes, sir.
17     Q   Now, would you receive any other documentation
18   regarding Mr. X prior to the preparation of your report?
19     A   Not typically.
20     Q   Now, would you do anything in preparation for
21   your examination of Mr. X?
22     A   I don't know what -- I don't understand.  I
23   don't understand that question.
24     Q   Mr. X is coming to your house hypothetically
```

Page 42

```
1    tomorrow morning.  Do you understand me so far?
2         MR. VINSON:  Objection, argumentative.
3      A   Yeah.
4         (Mr. LaBoon leaves the deposition room.)
5    BY MR. MULHOLLAND:
6      Q   All right.  Would you do anything before Mr. X
7    arrives to prepare for his examination?
8      A   I don't know.  I would probably buy some Cokes
9    or some water, you know.  The man might have traveled a
10   long way.
11     Q   Anything else?
12     A   No.
13     Q   How long would it take you to read Mr. X's
14   x-ray and prepare a B read?
15     A   If it's an analog film, probably a minute.  If
16   it's a disk, it would probably take three or four
17   minutes, five minutes.
18     Q   Incidentally, you don't read CT scans; is that
19   right?
20     A   No.
21     Q   How long typically would your examination,
22   including your interview, of Mr. X take?
23     A   Probably 15 minutes.
24     Q   So would it be fair to say then that prior to
```

Page 43

```
1    your -- the preparation of your report, you would have
2    invested maybe 20 minutes total, five minutes with a B
3    read and 15 minutes for the examination, peculiar to
4    Mr. X?
5      A   Yes.
6         (Mr. LaBoon re-enters the deposition room.)
7    BY MR. MULHOLLAND:
8      Q   And how long does it typically take you to
9    prepare your report?
10     A   Usually ten minutes.
11     Q   Now, in the past, have you ever examined
12   multiple people in a day for purposes of asbestos
13   evaluation?
14     A   Yes.
15     Q   And how many people have you examined in a day
16   for purposes of asbestos evaluation?  What's the maximum
17   number you've done?
18     A   About 20.
19     Q   And was that in connection with some screening
20   event?
21     A   Screening.  I've done screenings.
22     Q   And those would be for plaintiffs' lawyers?
23     A   Yes, sir.
24     Q   All right.  And typically, those are done in,
```

Page 44

```
1    what, hotels?
2      A   Hotels or union halls.  I've done some in union
3    halls.
4      Q   You've done them both in hotels and union
5    halls?
6      A   Uh-huh.
7      Q   For what plaintiffs' lawyers have you done
8    that?
9      A   Mr. O'Shea.
10     Q   Any others?
11     A   No.  Well, not recently.  I did some for
12   Mr. Halstead back in the day, but that's been a long
13   time ago.
14     Q   Okay.  Now, when you did those screening
15   events, did you also read the x-rays -- were the
16   plaintiffs x-rayed on the day of the screening event?
17     A   Typically, I had read the x-rays before, but
18   sometimes I read them on the day of the x-ray.  I'll
19   read the x-rays the day of screening.
20     Q   So there were occasions where plaintiffs came
21   in, were x-rayed, you read the x-ray and also did an
22   examination; is that right?
23     A   Yes, sir.
24     Q   Have you done any screening events for
```

11 (Pages 41 to 44)

Page 125

DIRECT EXAMINATION

1   BY MR. FERGUS:
2      Q   Good morning.  This is Sean Fergus with
3   O'Connell, Tivin, Miller & Burns, and I have a couple of
4   follow-up questions regarding the testimony already
5   elicited, and then I have some other additional general
6   questions for the doctor.
7         Doctor, when you were testifying earlier, you
8   said that you're working -- you've worked with a friend
9   since 2003.  Who is that friend you've been working with
10  since 2003?
11     **A   I don't recall saying working with a friend.  I**
12  **don't recall that.**
13     Q   Have you been working with another medical
14  practice --
15     **A   Oh, okay.**
16     Q   -- other than --
17     **A   Okay.  I -- I have a friend with an office.**
18     Q   And who is that friend at the office?
19     **A   That's Dr. Gupta, G-u-p-t-a.**
20     Q   And what type of practice does Dr. Gupta have?
21     **A   Occupational medicine.  He's a board-certified**
22  **occupational medicine physician.**
23     Q   And what's the name of the practice?

Page 126

1      **A   It's called G'n'G P.O.E.M.S, P-O-E-M-S.**
2      Q   And are you a partner, or do you just use their
3   office facilities?
4      **A   No.  I keep my license there, and every once in**
5   **a while I work for him, you know, when he wants to go on**
6   **vacation.  But I haven't done that in a long time.**
7      Q   When was the last time you worked for G'n'G?
8      **A   Oh, I guess it's probably been two years.**
9      Q   So approximately 2012?
10     **A   Probably so.**
11     Q   Something else you said earlier is that you do
12  not read CT scans?
13     **A   That's correct.**
14     Q   Why is it you don't read CT scans?
15     **A   I'm not qualified.  I'm not trained to read CT**
16  **scans.**
17     Q   Is there a specific qualification or a test
18  that you take for CT scans?
19     **A   That's in the realm of a radiologist.  There's**
20  **no standards for CT scans, as far as the pneumoconiosis**
21  **are concerned.  So, I mean, I haven't been trained in**
22  **that, and I haven't been tested in that.  You know, I --**
23  **so I don't even look at the CT scans.**
24     Q   Okay.  So you don't hold yourself out as an

Page 127

1   expert in radiology; is that correct?
2      **A   That's correct.**
3         MR. VINSON:  Objection, asked and answered.
4   BY MR. FERGUS:
5      Q   And, Doctor, what do you consider to be an
6   ambient air level of asbestos, or do you have an opinion
7   at all?
8         MR. VINSON:  Objection.
9      **A   Levels that are well below a PEL level, for**
10  **certain, and magnitude below a PEL level.**
11  BY MR. FERGUS:
12     Q   And, sir, what -- you talked about reading
13  books regarding the Navy.  What books have you read
14  regarding the Navy?
15        MR. VINSON:  Objection, asked and answered.
16     **A   There was some information on Navy exposure,**
17  **Dr. Hammar's book.  And I went to school, and that was**
18  **all part of stuff that we learned in school.  I did an**
19  **occupational medicine residency, and, you know, we had**
20  **that in lectures about exposures, various occupational**
21  **exposures.  So that's part of my training in**
22  **occupational medicine, is to discuss occupational**
23  **exposures that our professors told us about.  Just like**
24  **when you go to school to learn law, you know, your law**

Page 128

1   **professors tell you stuff.  We had the same thing.**
2         MR. FERGUS:  Okay.  Move to strike the
3   nonresponsive portion of the witness's testimony.
4   BY MR. FERGUS:
5      Q   Sir, what books have you read regarding Naval
6   exposures?
7         MR. VINSON:  Same objection.
8      **A   That's the one I -- I think it's mentioned in**
9   **Mr. -- in Dr. Hammar's book, about exposures in the**
10  **Navy, exposures on ships, and --**
11  BY MR. FERGUS:
12     Q   Okay.  So you rely on Dr. Hammar's book.  Are
13  there any other books?
14     **A   Not that I can recall.**
15        MR. VINSON:  Same objection.
16     **A   Dr. Hammar talks about that, you know, they**
17  **didn't use asbestos early in ship building, but they**
18  **started using it in the '30s.  But, you know, they**
19  **decided that it was very important for, you know, for**
20  **fire control, and consequently, you know, Navy personnel**
21  **were exposed to asbestos.  And asbestos in shipyards,**
22  **when Navy vessels were dry docked, there's a lot of**
23  **exposure in that -- in that setting, too.  The sailors**
24  **were required to help to redo the ships.**

32  (Pages 125 to 128)

Page 129

1       And Dr. Selikoff, I think he did most of his
2    work on shipyards, workers that worked on ships,
3    including Navy ships.
4       MR. FERGUS:  Move to strike the nonresponsive
5    portion of the witness's testimony.
6    BY MR. FERGUS:
7       Q   Doctor, do you consider Dr. Selikoff to be
8    authoritative?
9       MR. VINSON:  Objection.
10      A   From what I learned in school, he's
11   authoritative.  I mean, what do you mean by
12   "authoritative"?
13   BY MR. FERGUS:
14      Q   Do you believe him to have a specialized
15   knowledge in the area of asbestos?
16      MR. VINSON:  Objection.
17      A   He didn't -- he did research on asbestos
18   exposure.  He's referred to in a lot of the literature.
19   I don't know him personally.  The man's been dead a
20   while now, I'm pretty certain.
21   BY MR. FERGUS:
22      Q   Would his writings be something that people
23   generally rely upon in the industrial hygiene and
24   medical --

Page 130

1       MR. VINSON:  Objection, form, foundation,
2    vague.
3       A   I don't -- you know, he developed information
4    about exposure and disease as far as asbestos exposure
5    is concerned.
6    BY MR. FERGUS:
7       Q   You know what?  Let me clear that up.  Let me
8    ask the question this way, Doctor.  Is Dr. Selikoff
9    someone who you would refer to if you had questions
10   about asbestos medicine?
11      MR. VINSON:  Objection.
12      A   You know, I don't understand that question.
13   BY MR. FERGUS:
14      Q   Let me ask it again a different way.
15      A   It's too vague, you know.
16      Q   If you were going to write -- if you were going
17   to write a paper on asbestos, would Dr. Selikoff be
18   someone that you would cite in your paper?
19      MR. VINSON:  Objection to the hypothetical,
20   form.
21      A   I don't know.  I can't answer that.  I don't
22   know.
23   BY MR. FERGUS:
24      Q   Do you know what studies Dr. Selikoff issued?

Page 131

1       A   I don't have -- I don't have any -- a list of
2    them here.
3       Q   With regard to your -- the first and the second
4    reports, you said that the second report you read and
5    signed.  Who actually typed the second report --
6       A   Mr. Vinson.
7       Q   -- in your cases?
8       A   Mr. Vinson.
9       Q   Mr. Vinson?
10      A   Yes, sir.
11      Q   And I believe you said that you didn't add or
12   subtract anything.  Did you edit the reports written by
13   Mr. Vinson?
14      MR. VINSON:  Objection.
15      A   I didn't edit them.  I signed them.  I read
16   them over.  I thought that they reflected what was in my
17   report.
18   BY MR. FERGUS:
19      Q   And then with regard to a question that was
20   asked earlier, I don't believe you actually responded to
21   the question that was asked.  Do you have a dose that
22   you require for someone to get asbestosis?
23      MR. VINSON:  Objection, asked and answered.
24      A   It's undetermined.  No way you can determine

Page 132

1    that, for an individual to get asbestosis or to develop
2    an asbestos-related pulmonary disease.
3    BY MR. FERGUS:
4       Q   How would you go about ascertaining somebody's
5    individual susceptibility?
6       MR. VINSON:  Objection, asked and answered.
7       A   It's impossible to determine.
8    BY MR. FERGUS:
9       Q   Now, you said that you start the latency
10   period.  When do you start the actual latency period?
11   At what point?
12      MR. VINSON:  Objection, asked and answered.
13      A   When a person's exposed.
14   BY MR. FERGUS:
15      Q   Okay.  At what -- the baby is delivered, he's
16   in the maternity ward, there's ambient asbestos fibers
17   in the air.  Is that when you start your latency period?
18      MR. VINSON:  Objection, mischaracterizes his
19   prior testimony, asked and answered, foundation.
20      A   I'm talking about the significant occupational
21   exposure, medically reasonable occupational significant
22   exposure.
23   BY MR. FERGUS:
24      Q   And what do you consider to be significant

33  (Pages 129 to 132)

Page 133

1   exposure?
2       MR. VINSON:  Objection, asked and answered.
3       **A   Exposure where the man worked in an environment**
4   **where asbestos dust was present, actually worked with**
5   **asbestos, drilled through asbestos-containing products,**
6   **used asbestos to insulate pipes and valves and worked**
7   **with gaskets, you know, occupational exposure to**
8   **asbestos.**
9       **Or, you know, in the case of people who aren't**
10  **occupationally exposed, it's significant exposure,**
11  **secondhand exposures.  Like people who have significant**
12  **secondhand smoke exposure, they can have significant**
13  **secondhand exposure.**
14  BY MR. FERGUS:
15      Q   Doctor, are you aware of any peer-reviewed
16  articles that indicate that asbestosis can be caused by
17  secondary exposure?
18      MR. VINSON:  Objection.
19      **A   I don't have any here with me.**
20  BY MR. FERGUS:
21      Q   Are you aware of any?
22      **A   There are articles that address that, but I**
23  **don't have them here.**
24      Q   Do you know the authors?

Page 134

1       **A   No.**
2       Q   Do you know the titles?
3       **A   No.**
4       Q   Do you know where those were published?
5       **A   No.**
6       MR. FERGUS:  Are we still on?
7       MR. LaBOON:  Yes.
8       MR. FERGUS:  Okay.  I didn't get the response
9   to the last question.
10      THE WITNESS:  No.
11  BY MR. FERGUS:
12      Q   Do you know when those articles would have been
13  written?
14      **A   No.**
15      Q   And also, the cases that are before us today,
16  none of those are mesothelioma cases, correct?
17      **A   That's correct.**
18      Q   When you get these cases from Mr. Vinson's
19  office, who selects -- who selects the films?
20      **A   Who does what now?**
21      MR. LaBOON:  Selects the films.
22  BY MR. FERGUS:
23      Q   Who selects the films that you review?
24      **A   Mr. Vinson sends me the films.**

Page 135

1       Q   Okay.  How does he -- well, let me ask you
2   this.  Do you know how he selects those films?
3       **A   Gets the film from the client.  I mean, the**
4   **film has the client's name on it.**
5       Q   And how many films do you generally review for
6   an individual plaintiff?
7       **A   One film.**
8       Q   So you don't review any radiology prior to that
9   one film?
10      **A   No.**
11      Q   And you don't do any follow-up with regard to
12  radiology on that -- on any individual plaintiff?
13      **A   No.**
14      Q   Do you look -- again, just so the record is
15  clear, you don't look at any radiology reports from the
16  radiologist for any of those films, do you?
17      **A   No.**
18      Q   And when you get these films from Mr. Vinson,
19  are there instances where, say, he sends you a
20  posterior-to-anterior or anterior-to-posterior-type film
21  that doesn't meet the generally accepted standards for
22  radiological interpretation in asbestos cases?
23      **A   I don't -- I don't read -- if I know it's an**
24  **AP, I don't read it.  I put it as unreadable.  Usually**

Page 136

1   **if you have an AP, it's in a critical care setting,**
2   **intensive care or emergency department, and it's**
3   **unlikely that I would read an AP.**
4       Q   Do you know if you received any AP films in any
5   of these cases?
6       **A   No.**
7       Q   And you would agree that the PA is a standard
8   for ILO, correct?
9       **A   Yes, that's -- it's made for a PA.  It's set up**
10  **for a PA film.**
11      Q   Okay.  And do you know how Mr. Vinson's able to
12  screen films for PA versus AP images?
13      **A   No.**
14      Q   Okay.  Do you get cases where, say, you get
15  overpenetration or underpenetration of the films?
16      **A   Occasionally.**
17      Q   Do you know if any of the films that you
18  reviewed in this case, any of these cases -- perhaps I'm
19  going to -- actually, I'll save that later when we get
20  more case specific, so I'll strike the last question.
21      You would agree, though, that underpenetration
22  and overpenetration can hamper the interpretation of the
23  films?
24      **A   All depends how -- to what degree the**

34  (Pages 133 to 136)

Page 157

1    A   An exposure like that is probably unlikely to
2   cause any disease.  It may cause some disease if you
3   live to be, say, 200 years old.
4   BY MR. STEVENS:
5    Q   Okay.  Would such an exposure be lower than a
6   background level?
7    A   I don't know.  I mean, I don't know what the
8   background level would be.
9    Q   Okay.  Sir --
10      THE WITNESS:  I've got to do something.  I have
11      to plug in my computer.
12  BY MR. STEVENS:
13   Q   You also mentioned --
14      MR. LaBOON:  Hold on.
15      MR. VINSON:  Can we take two minutes?  He's got
16      to plug in his computer.  It's dying.
17      MR. STEVENS:  Certainly.
18      MR. VINSON:  Thank you.
19      THE WITNESS:  Okay.  Here we go.
20      MR. STEVENS:  Are you ready to resume, sir?
21      THE WITNESS:  Yes, sir.
22  BY MR. STEVENS:
23   Q   All right.  You mentioned some articles between
24  linking secondary exposure to asbestos and asbestosis.

Page 158

1   Do you recall speaking about those?
2       MR. VINSON:  Objection.
3    A   I don't have any specific articles.  We learned
4   that in school.  You know, I studied occupational
5   medicine.
6   BY MR. STEVENS:
7    Q   I understand, sir.  I'm not asking about
8   specific articles.  I'm just wanting to highlight that's
9   where I'm going to return to.  Okay?
10   A   I don't have any specific articles.
11   Q   You were talking about some things either from
12  school or wherever.  Do you recall reading any articles
13  that specifically link secondary exposure to asbestos?
14   A   Not offhand.  I haven't done that recently.
15      MR. STEVENS:  Okay.  Actually, I believe that
16      may be all the questions I have, at least for the
17      general questions.
18      MR. LaBOON:  Any other general questions?
19         FURTHER DIRECT EXAMINATION
20  BY MR. MULHOLLAND:
21   Q   All right.  Doctor, Danny Mulholland.  Let's go
22  to Richard Bell.  I have a June 15th, 2000 [sic] report
23  that you prepared for Mr. Bell.  Do you have that?
24   A   Let's see.  Richard Bell.

Page 159

1       MR. VINSON:  Yeah, I think that's it.  June
2       15th, 2013?
3       MR. MULHOLLAND:  Yes.
4   BY MR. MULHOLLAND:
5    Q   Doctor?
6    A   Yeah, I have the report here.
7    Q   Okay.  And also, I have a B read by you of that
8   same date, June 15th, 2013?
9    A   Let's see.  Yes, sir.  I see it right here.  I
10   read it on June 15th, 2013.
11   Q   And, in addition, I have a report signed by
12  you, which is undated, as far as I can tell, and this is
13  a report that was prepared by Mr. Vinson that you
14  signed.  Do you have that report?  It's captioned
15  "Report of Dr. Matthew Vuskovich."
16   A   I'm sure I do.  I've got to find it.
17      MR. VINSON:  It's Vuskovich, but I'm sure
18      that's not the first time his name has been
19      mispronounced.
20      THE WITNESS:  Let's see.
21      MR. VINSON:  Here you go.  Down here.
22      Vuskovich rule 26 report, Bell.
23      THE WITNESS:  Okay.  Yeah, I see this one.
24  BY MR. MULHOLLAND:

Page 160

1    Q   So do you have all three of those reports?
2    A   Yeah.
3    Q   Yes?
4    A   Let's see.  Let me find -- let's see.
5       MR. VINSON:  Yeah.  See your tabs up here?
6       THE WITNESS:  Okay.
7       MR. VINSON:  Yeah, you've got all three.
8       THE WITNESS:  Yeah, I have all three of them.
9   BY MR. MULHOLLAND:
10   Q   What else do you have in your file regarding
11  Mr. Bell?
12   A   That's all I have, are these three documents.
13   Q   Okay.  Did you ever have any other documents
14  regarding Mr. Bell?
15   A   We had --
16      THE WITNESS:  You had provided me with a -- is
17      it a deposition or -- about his occupation.
18      Mr. Bell died, right?
19      MR. VINSON:  Uh-huh.
20      THE WITNESS:  We -- I don't have it with me,
21      though.
22  BY MR. MULHOLLAND:
23   Q   So you were talking to your counsel just then.
24  I don't -- I'm not sure what the answer to my question

40  (Pages 157 to 160)

Page 169

1    That's it. Those four items.
2        Q   All right. Mr. Greenleaf. Doctor, very
3    specifically, I'm not interested in your reports. I
4    want to know what you were provided in terms of
5    documents about Mr. Greenleaf. What were you provided
6    about Mr. Greenleaf?
7        A   I was -- I just had his x-ray. That's what I
8    had, his x-ray.
9        Q   The x-ray on which you did a B reading?
10       A   Yeah, but I interviewed Mr. Greenleaf. I was
11   provided with the information that he gave me.
12       Q   Okay. How about Mr. Neureuther? What were you
13   provided about Mr. Neureuther?
14       A   Provided with his x-ray, and I interviewed
15   Mr. Neureuther.
16       Q   All right. Any other documents you were
17   provided about Mr. Neureuther?
18       A   Not that I see. I don't have them if I was. I
19   can't recall, and I don't have them here in the record.
20       Q   All right. Mr. Kochera, what were you
21   provided -- what documents were you provided about
22   Mr. Kochera?
23       A   Mr. Kochera, I'm sure we did a B read on
24   Mr. Kochera, too.

Page 170

1        THE WITNESS: Do we have that?
2    BY MR. MULHOLLAND:
3        Q   You may have done a B read, but that wouldn't
4    have been a document --
5        A   The x-ray.
6        Q   -- that you were provided about Mr. Kochera?
7        A   That's it. I interviewed Mr. Kochera.
8        MR. VINSON: It might be there, the read -- no,
9        that's McAlvey.
10       THE WITNESS: I don't have any other documents,
11       just what I have here.
12   BY MR. MULHOLLAND:
13       Q   All right. Now, with respect -- let's go back
14   to Mr. Bell.
15       With respect to Mr. Bell, did you review his
16   potential exposure to other pulmonary irritants and
17   toxins?
18       A   No.
19       Q   So if I asked you that same question about any of
20   the four other plaintiffs, Mr. Kochera, Mr. McAlvey,
21   Mr. Greenleaf and Mr. Neureuther, would your answer be
22   the same?
23       A   Yes.
24       Q   Now, did you follow a protocol for the

Page 171

1    B reading interpretations you did of the x-rays of these
2    five plaintiffs?
3        MR. VINSON: Objection, asked and answered.
4        A   I don't know what you mean by "protocol." What
5    do you mean by "protocol"? Like some type of published
6    protocol? I don't know.
7    BY MR. MULHOLLAND:
8        Q   Do you -- does the word "protocol" have meaning
9    to you?
10       MR. VINSON: Objection, argumentative.
11       A   I don't know what you mean by follow a
12   protocol. I mean, I have a certain technique that I use
13   to read the x-rays, but, you know, I don't understand
14   what --
15   BY MR. MULHOLLAND:
16       Q   So you can't answer my question about protocol?
17       A   I mean, a published protocol by some agency? I
18   don't know what you mean by "a protocol."
19       Q   Okay. With respect to Mr. Bell, did you
20   consider other causes for the abnormalities seen on
21   Mr. Bell's chest x-ray?
22       A   No.
23       Q   If I asked that same question with respect to
24   any of the other four plaintiffs, would your answer be

Page 172

1    the same?
2        A   Yes, sir.
3        Q   Were you provided with any of the interrogatory
4    answers of these five plaintiffs?
5        MR. VINSON: Objection.
6        A   No.
7        MR. MULHOLLAND: That's all the questions I
8    have. Thank you.
9        MR. LaBOON: On Bell or total?
10       MR. MULHOLLAND: Yeah.
11       MR. VINSON: Okay.
12       (Mr. Mulholland leaves the deposition room.)
13          FURTHER DIRECT EXAMINATION
14   BY MR. LaBOON:
15       Q   Doctor, I'm going to ask you about Mr. Bell and
16   see if anybody else has any questions on each individual
17   plaintiff. All right?
18       A   Sure.
19       Q   So do you have your two reports concerning
20   Mr. Bell available?
21       A   Let's see, Mr. Bell.
22       Q   First of all, is there a reason why you don't
23   bring your reports to your depositions?
24       A   Well, I have the reports right here.

43  (Pages 169 to 172)

Page 173

1      MR. VINSON:  There you are.
2      THE WITNESS:  Let's see.  These three?
3      MR. VINSON:  Yeah.  They're all here.  You've
4  got to toggle between the tabs.
5      THE WITNESS:  That's not all of Bell's.
6  BY MR. LaBOON:
7      Q   Do you have other documents for Mr. Bell on
8  your computer other than your B --
9      MR. VINSON:  That's it, too.
10  BY MR. LaBOON:
11     Q   -- other than your B read form, your B read
12  report, your report to Mr. Vinson, and then what we'll
13  call your rule 26 report?
14     A   That's the only thing I have.
15     Q   All right.  So we know -- we know that you
16  received apparently just one x-ray from Mr. Vinson, and
17  you read that on 6/15/2013, correct?
18     A   Yeah, I have a -- I have a B -- an ILO form and
19  a narrative interpretation, too.
20     (Mr. Mulholland re-enters the deposition room.)
21  BY MR. LaBOON:
22     Q   Okay.  And then looking at your report from
23  June 15th, 2013, there's some information in the first
24  paragraph on Mr. Bell's service in the Navy, correct?

Page 174

1      A   Yes, sir.
2      Q   And then there's information about his work at
3  Ford Motor Company, correct?
4      A   Yes, sir.
5      Q   It's your -- it's your testimony, I believe,
6  that you received information from plaintiffs'
7  counsel?
8      A   Yes, sir.
9      Q   Okay.  You did not read any depositions in this
10  case, correct?
11     A   No, sir.
12     Q   In fact, you haven't read any depositions for
13  any of these five plaintiffs?
14     A   No, sir.
15     Q   Haven't reviewed any discovery responses?
16     A   No, sir.
17     Q   That's a correct statement?
18     A   That's correct.
19     Q   Okay.  Do you know how many medical records you
20  received -- and you've shredded the document that
21  discusses his work history.  Right?
22     A   I didn't shred it.  I gave it back to
23  Mr. Vinson.
24     Q   Okay.  Personally, you handed that document

Page 175

1  back to Mr. Vinson?
2      A   (Witness nodding head.)  Yeah, that's part of
3  his records.
4      Q   Do you have any e-mail exchanges with
5  Mr. Vinson concerning any of these five cases?
6      A   I don't believe.
7      Q   And then the -- besides a pathology report from
8  3/3/2012, do you believe that you had any other
9  documents, medical records, for Mr. Bell?
10     A   No.
11     MR. VINSON:  Objection, asked and answered.
12  BY MR. LaBOON:
13     Q   You have essentially a pathology report, and
14  that's it?
15     A   Yes, sir.
16     Q   Okay.  It says here that physicians found lung
17  tissue changes that were consistent with cigarette
18  smoking, including emphysema, right?
19     A   Yes, sir.  Yeah.
20     Q   Okay.  Did you ever attempt to determine
21  Mr. Bell's cigarette smoking history?
22     A   No.
23     Q   Why?
24     A   It's irrelevant.

Page 176

1      Q   His cigarette smoking history is irrelevant to
2  your opinions in this case?
3      A   If anything, it increases the risk of him
4  developing a pulmonary disease condition caused by
5  asbestos exposure.
6      Q   Okay.  We'll get to that.  But in a lung cancer
7  patient, you don't care about their cigarette smoking
8  history?
9      MR. VINSON:  Objection, argumentative.
10     A   Yeah, I mean, it's important to have -- lung
11  cancer -- cigarette smoking causes lung cancer, but
12  asbestos exposure causes lung cancer, too.
13     MR. LaBOON:  Object to the responsive portion,
14  nonresponsive portion.
15  BY MR. LaBOON:
16     Q   Then I want to explore with you, I guess, the
17  last sentence of your report.  It says, "The combined
18  smoking/asbestos exposure cancer risk is multiplicative
19  and referred to as a synergistic effect," correct?
20     A   Yes, sir.
21     Q   Okay.  What is the basis for that opinion?
22     A   It's what I learned in school.  You see it in
23  articles, that the combination of the two increases the
24  risk of lung cancer beyond -- beyond an additive effect.

44  (Pages 173 to 176)

Page 181

```
1    BY MR. LaBOON:
2        Q   Okay.  And then you said, "As part of my
3    review, I obtained a history of his military service."
4    And, again, would that have been the correspondence from
5    plaintiffs' counsel?
6        A   Yes, sir.
7        Q   And when it says you reviewed his occupational
8    records and medical records in this rule 26 report, that
9    really should say "medical record," right, singular?
10           MR. VINSON:  Objection.
11       A   That -- that's the only thing I had.
12   BY MR. LaBOON:
13       Q   Did you ask plaintiffs' counsel for any other
14   records concerning Mr. Bell?
15       A   No.
16       Q   Is there any other literature you can cite to
17   the judge and jury in this case sitting here today that
18   are going to support your opinions that Mr. Bell's lung
19   cancer was caused in part by his alleged exposure to
20   asbestos?
21       A   Not right offhand.  I mean, we have the article
22   we just looked at.  Other than that --
23       Q   So other than the Markowitz article -- you
24   agree with me, first of all, the ATS paper from 2004
```

Page 182

```
1    actually is only discussing nonmalignant diseases,
2    correct?
3        A   Yeah.  Let's see what this says right here.
4    This paper says, "At a glance, asbestos exposure alone
5    increases lung cancer mortality among nonsmokers and
6    adds to smoking-associated lung cancer risk.  Asbestosis
7    further increases the lung cancer risk, and considered
8    jointly with smoking, has a supra additive effect.
9    Insulators benefit greatly by quitting smoking."
10           (Mr. Mulholland re-enters the deposition room.)
11   BY MR. LaBOON:
12       Q   All right.  You're reading from what, the
13   synopsis in the Markowitz paper again?
14       A   Yes, sir.
15       Q   Okay.  Do you know what Dr. -- first of all,
16   you would agree with me that insulators were a very
17   heavily exposed cohort?
18       A   Yes, sir.
19       Q   Okay.  Are you prepared to testify today that
20   Mr. Bell was exposed to asbestos in a fashion similar to
21   a career insulator?
22           MR. VINSON:  Objection.
23       A   I don't know exactly what his exposure was.
24   BY MR. LaBOON:
```

Page 183

```
1        Q   Okay.  Have you ever seen Dr. Selikoff's
2    statements concerning comparing insulators and --
3    exposure to asbestos as opposed to other crafts?
4        A   No, I haven't seen those statements.
5        Q   Have you ever seen Dr. Selikoff's statement in
6    1968 that he had never seen a case of lung cancer in a
7    nonsmoker?
8        A   No.
9        Q   Okay.  So the only paper that you can cite
10   sitting here today is, that you believe support your
11   opinions, is the Markowitz paper?
12           MR. VINSON:  Objection, asked and answered.
13   BY MR. LaBOON:
14       Q   For Mr. Bell's opinions concerning lung cancer,
15   is that it?
16       A   That's what I have right here with me.
17       Q   Okay.  Do you agree that asbestosis is -- can
18   be a progressive disease?
19       A   Yes, sir.
20       Q   Okay.  Do you know how Dr. Markowitz diagnosed
21   asbestosis in this cohort?
22       A   Let's see.  I would have to read it again.  I
23   don't know specifically how he diagnosed it.
24       Q   Do you know the last time Dr. Markowitz and
```

Page 184

```
1    these other authors examined any of the insulators that
2    are discussed in this paper?
3        A   No.
4            MR. LaBOON:  I believe that's all the questions
5    I have for Mr. Bell.  Does anybody on the phone?
6            MR. MULHOLLAND:  Can we take a quick break?
7            MR. VINSON:  Yeah.
8            MR SCHROER:  I have a few for Bell.
9            MR. LaBOON:  I think we're going to take a
10   quick break.
11           (A recess was taken from 1:41 p.m. to
12   1:51 p.m.)
13           (Mr. Mulholland leaves the deposition room.)
14   BY MR. LaBOON:
15       Q   Doctor, I asked a couple of questions that
16   hopefully then will short circuit other people's
17   questions concerning their clients.
18           You have not -- you don't know what any of
19   these plaintiffs -- except for asbestos generally, you
20   don't have any specific opinions about any company that
21   the plaintiffs have sued in these cases, correct?
22       A   I don't have -- I don't have any information on
23   that.
24       Q   Okay.  You don't know what they're alleging
```

Page 185

1    exposure to?
2        A   No, sir.
3        Q   And you form no opinions on those issues?
4        A   No, sir.
5        Q   You don't even know who the defendants are in
6    this case, do you?
7        A   No, I don't.
8        Q   And that's not typically the type of testimony
9    you ever provide, correct?
10       A   That's correct.
11       Q   You don't plan on doing that in this case?
12       A   No.
13           MR. LaBOON:  Hopefully that killed 100
14   questions.  I'm passing the witness as to Mr. Bell.
15           MR. FERGUS:  Hello, this is Sean Fergus again.
16   Oh, go ahead.
17           MR. SCHROER:  Thanks, Sean.
18               FURTHER DIRECT EXAMINATION
19   BY MR. SCHROER:
20       Q   Mike Schroer again.
21           Just so the record is clear, you haven't seen
22   any interrogatories or other discovery responses from
23   any defendants in this lawsuit, have you?
24       A   No, sir.

Page 186

1        Q   Okay.  And you've not read any documents
2    pertaining specifically to any defendant in this
3    lawsuit, have you?
4        A   No, sir.
5        Q   And you've not reviewed any testimony of any
6    representative of any defendant in this lawsuit, have
7    you?
8        A   No, sir.
9        Q   Okay.  I want to ask you just a little bit
10   about your B read in this case and the narrative report
11   that's attached to it.  The narrative report says, among
12   other things, and I quote, "Because of partial
13   pneumothorax and pleural effusion, his left lung could
14   not be evaluated for small opacities," end quote.
15           Does that mean, given the limitations of the
16   film you reviewed, you could not determine whether the
17   opacities that you noted on the B read were bilateral or
18   unilateral?
19       A   It was impossible to tell, sir.
20       Q   Thank you.  Okay.  You gave a perfusion of 2.1
21   and noted plaque.  I understand you have not seen the
22   hospital radiologist's interpretation of the film that
23   you reviewed, that film being dated February 2012; is
24   that correct?

Page 187

1            MR. LaBOON:  I think you mean two slash -- this
2    is John.  I think you mean 2/1, not 2.1.
3            MR. SCHROER:  Yes, my mistake.  I meant 2/1.
4    BY MR. SCHROER:
5        Q   Doctor, have you seen the hospital
6    radiologist's interpretation of the February 20th, 2012,
7    film that you reviewed?
8        A   No, sir.
9            MR. VINSON:  That's there.
10           THE WITNESS:  That's not a B read.
11   BY MR. SCHROER:
12       Q   Would you find it unusual if the hospital
13   radiologist didn't note pneumoconiosis or pleural
14   plaques on that film?
15       A   I didn't find any pleural plaques.  I didn't
16   find any pleural plaques.
17           THE WITNESS:  Are we still talking about
18   Mr. Bell?
19           MR. VINSON:  Uh-huh.
20   BY MR. SCHROER:
21       Q   Yeah.
22       A   I didn't find any pleural plaques.  There's no
23   pleural plaques.
24       Q   Would you find it unusual that the hospital

Page 188

1    radiologist did not note pneumoconiosis on that film?
2        A   They -- did he do a -- did he do a B reader?  I
3    didn't see it.  I didn't see any other B reads.
4        Q   Would you agree that an asbestosis case with a
5    perfusion of 2/1 is a relatively advanced case?
6            MR. VINSON:  Objection.
7        A   Relatively --
8            MR. VINSON:  Vague.
9            THE WITNESS:  -- compared to what?  I mean,
10   it's a mid category, leaning toward --
11   BY MR. SCHROER:
12       Q   Would asbestosis with a perfusion of 2/1 have
13   radiographic features that you would expect the
14   practicing hospital radiologist to note on his radiology
15   report of the film?
16       A   I would, but, you know, I don't know what he --
17   you know.  He's more interested in other things, you
18   know.
19       Q   And you don't know one way or the other whether
20   Mr. Bell's doctors ever diagnosed him with asbestosis,
21   do you?
22       A   No.
23       Q   I'm sorry, Doctor.  If you answered the
24   question, I didn't hear you.

Page 193

1  Q  Did you see any indication that Mr. Bell had an
2  elevated asbestos lung fiber burden?
3  **A  No, it wasn't in the pathology report.**
4  Q  Okay.  Your rule 26 report says that -- hang on
5  for a second.  Maybe I can get this.
6  Okay.  Your rule 26 report says that you
7  reviewed Mr. Bell's potential exposure to other
8  pulmonary toxins and irritants.  If you didn't meet
9  Mr. Bell and only saw one medical record, how did you go
10  about doing that?
11  MR. VINSON:  Objection, form.
12  **A  Just from information provided by Mr. Vinson.**
13  BY MR. SCHROER:
14  Q  You're talking about the work history document?
15  **A  Yes, sir.**
16  Q  Is that correct?
17  **A  Yes, sir.**
18  Q  Okay.  But you didn't have an opportunity to
19  ask Mr. Bell specific questions about any other toxins
20  or irritants that he may have been exposed to, correct?
21  **A  That's correct.**
22  Q  Okay.  And you wouldn't have had any
23  information about other toxins and irritants other than
24  anything Mr. Bell's attorney gave you; is that correct?

Page 194

1  **A  That's correct.**
2  Q  Okay.  And I know we had discussed that you are
3  not a pathologist.  Are you able to interpret the
4  results of the pathology report as they were reported?
5  And what I mean is the immunohistochemical stains.
6  **A  I just can read the report and see what the**
7  **pathologist said.  I don't have any specific knowledge**
8  **of the histopathology staining.**
9  Q  I should have asked a clearer question.  What I
10  mean is, you would not be a person who would confirm or
11  dispute the diagnosis that was rendered on that
12  pathology report; is that true?
13  **A  That's correct, sir.  I have to rely completely**
14  **on the pathologist's report.**
15  Q  And your rule 26 report says that each and
16  every exposure to asbestos that is nontrivial in context
17  contributes to the interstitial scarring of the lungs
18  which is asbestosis.
19  Do I understand you to mean that it's your
20  opinion that each and every exposure Mr. Bell had above
21  background contributed to the causation of his
22  asbestosis and his lung cancer in this case?
23  **A  Yes, sir.  In my opinion, his occupational**
24  **exposure caused the lung cancer.**

Page 195

1  Q  Okay.  And you're not aware of any exposures
2  that you thought were trivial in context in this case,
3  are you?
4  MR. VINSON:  Objection, asked and answered.
5  **A  The only exposure history I have is what I was**
6  **provided, and it's documented in the report.**
7  BY MR. SCHROER:
8  Q  Okay.  When you reviewed the exposure history,
9  do you recall -- did you identify any exposures in the
10  exposure history document that you believe were trivial
11  in context?
12  **A  No, sir.**
13  Q  Okay.  And in rendering your causation opinions
14  in this case, you considered Mr. Bell's exposures
15  collectively; is that true?
16  **A  Yes, sir.**
17  Q  Okay.  You weren't evaluating his exposures
18  differently for any specific defendant or products in
19  this case; is that true?
20  **A  That's correct.**
21  MR. VINSON:  Objection, asked and answered.
22  BY MR. SCHROER:
23  Q  And you didn't attempt to quantify his
24  cumulative exposure from all sources in terms of fiber

Page 196

1  years or anything like that, did you?
2  MR. VINSON:  Same objection.
3  **A  No, sir.**
4  BY MR. SCHROER:
5  Q  And you didn't attempt to quantify exposure
6  from any single source or defendant in terms of fiber
7  years, did you?
8  **A  No, sir.**
9  Q  And you did not rely on an industrial
10  hygienist's report in this case; is that true?
11  **A  That's correct.**
12  Q  And you haven't endeavored to determine whether
13  Mr. Bell's alleged exposure is attributable to any
14  defendant, were above or below permissible exposure
15  limits promulgated by OSHA or threshold limit values
16  established by the excuse me, have you?
17  MR. VINSON:  Objection.  He said he didn't do
18  defendant-specific research.
19  **A  That's correct, sir.**
20  BY MR. SCHROER:
21  Q  It's true, isn't it, that asbestos fibers have
22  to remain in a person's lungs to cause cancer, right?
23  MR. VINSON:  Objection, form.
24  **A  Yes, sir.**

49 (Pages 193 to 196)

Page 209

1    Q   Okay.  Are you reading that from somewhere?
2    A   Yes, sir.
3    Q   What are you reading that from?
4    A   From his pathology report.
5    Q   Okay.  And were you also aware that at one time
6    that his lung cancer was attributed to metastases from
7    his colon?
8    A   I don't have any information about that.
9    Q   Doctor, I don't want -- I don't want to go
10   through all these.  We've got several different
11   instances of pneumonia and different instances of lung
12   x-rays, and, again, you haven't looked at those, so
13   we'll just save those for trial.
14       The type of cancer that Mr. Bell had,
15   adenocarcinoma, you would agree with me that that is one
16   of the most common forms of cancer?
17   A   Yes, sir.
18   Q   And adenocarcinoma is not specific to the lung?
19   In other words, you can have adenocarcinoma of other
20   organs, correct?
21   A   Yes, sir.
22   Q   And adenocarcinoma can metastasize from one
23   part of the body to another; is that correct?
24   A   Yes, sir.

Page 210

1        MR. FERGUS:  All right.  I believe those are
2    all the questions I have for now.  I'll pass the
3    witness.
4        MR. LaBOON:  Anybody else for Mr. Bell?  Okay.
5    Let's go ahead and we'll do Mr. Kochera, Andrew
6    Kochera.
7        MR. VINSON:  Can we give him a minute to pull
8    up the documents, please?
9        MR. LaBOON:  Absolutely.  Yep.
10       MR. VINSON:  Kochera down here, third from the
11   bottom.
12       MR. FERGUS:  One more quick -- this is Fergus
13   again.
14       MR. LaBOON:  Go ahead.  This is back to
15   Mr. Bell?
16       MR. FERGUS:  Yes.
17   BY MR. FERGUS:
18   Q   Doctor, with regard to Mr. Bell, do you know
19   his height or weight at the time of his death?
20   A   No, sir.
21       MR. FERGUS:  Okay.
22       FURTHER DIRECT EXAMINATION
23   BY MR. LaBOON:
24   Q   Are you ready to discuss Mr. Kochera?

Page 211

1    A   Okay.  I've got it.
2    Q   Okay.  What I have from you from Mr. Kochera is
3    what we'll call your rule 26 report --
4        MR. VINSON:  Yeah, that's it.
5    BY MR. LaBOON:
6    Q   -- and then a B read that you performed on --
7    we don't know.  Your B read is based on a chest x-ray
8    from 10/28 of 2010, correct?
9    A   Yes, sir.
10   Q   Okay.  Your B read form is actually not
11   initialled, and the date of the reading is not --
12   A   Give me a second.  That's an error.  I didn't
13   put that in --
14   Q   So I'm correct --
15   A   -- the date of the read.
16   Q   I'm correct that the date of the reading is not
17   filled out?
18   A   That's correct.
19   Q   Okay.  And then we've got a report that is
20   dated May 18th of 2013, correct?
21   A   Yes, sir.
22   Q   Okay.  Did you review any pulmonary function
23   testing for Mr. Kochera?
24   A   No, sir.

Page 212

1    Q   Okay.  So specifically, you've never seen PFT
2    results from the Barnes-Jewish St. Peters Hospital from
3    3/23/13?
4    A   No, sir.
5    Q   I take it then you have no opinion as to
6    whether or not Mr. Kochera had any pulmonary impairment
7    from any source?
8        MR. VINSON:  Objection, form.
9    A   I don't have any information about that.
10   BY MR. LaBOON:
11   Q   Okay.  Your report dated May 18th of 2013
12   indicates that you reviewed an x-ray and then you
13   conducted a physical examination of Mr. Kochera,
14   correct?
15   A   Yes, sir.
16   Q   Besides your interview with Mr. Kochera, do you
17   have any other case-specific information concerning his
18   medical history?
19   A   No, sir.  I don't have any other information.
20       MR. VINSON:  Objection, form.
21   BY MR. LaBOON:
22   Q   Do you know whether or not -- did you explore
23   with Mr. Kochera whether or not his work as a fireman
24   would have exposed him to asbestos?

53  (Pages 209 to 212)

Page 213

1      A   A fireman -- a fireman and a policeman.
2      Q   Yes.
3      A   I asked him about that, and he said that he
4  didn't know of any exposure.  He thought all of his
5  exposure was when he was in the Navy, working as a
6  machinist as a young man.
7      Q   So where is the information where you asked him
8  about exposures as a fireman?
9      A   His past pulmonary history.  He said that his
10 physician diagnosed him with asbestosis and asbestos
11 pleural disease.  I don't have it documented.
12        MR. VINSON: He's talking about this.
13        THE WITNESS: Okay.
14        MR. VINSON: His work as a policeman.
15        THE WITNESS: I don't have it -- you know, I
16 didn't document it, but, you know, I asked him about
17 that.
18 BY MR. LaBOON:
19     Q   Do you --
20     A   I mean, that's why I put it in the record.
21     Q   Did you ask him the names of the doctors who
22 have allegedly diagnosed him with asbestosis or pleural
23 disease?
24     A   No.

Page 214

1      Q   Did you ask him about his smoking history?
2      A   Let's see.  He started smoking at age 17 and
3  quit at age 18, one-half pack a day.  That's what he
4  told me.
5      Q   Okay.  What is -- when you went to medical
6  school, and since then, have you become familiar with a
7  term called "secondary gain"?
8      A   Yes, sir.
9      Q   Okay.  What in your mind is secondary gain?
10     A   Secondary gain is usually a conscious or
11 subconscious effort to influence an opinion or influence
12 some type of situation where you can achieve your goals.
13 You know, it may be a subconscious thing, like feigning
14 an illness to gain sympathy or to avoid having to face a
15 situation if you're overly religious, or it could be
16 just pure out malingering.  It's hard to say.
17     Q   Secondary gain is certainly a concept that you
18 became familiar with doing your workers' comp work,
19 correct?
20     A   Yes, sir.
21     Q   Would underreporting a cigarette history,
22 smoking history, in your mind be a form of secondary
23 gain?
24        MR. VINSON: Objection.

Page 215

1      A   I don't know.  That's hard to say.  I don't
2  know why anybody would do that, as far as -- I guess.
3  Maybe.  I don't know.
4  BY MR. LaBOON:
5      Q   You understand --
6      A   I guess it could be a form of secondary gain.
7  You know, I've seen that dealing with coal miners, where
8  they say, well, they maybe smoked half a pack when they
9  smoked a pack a day or something like that.  I guess
10 that could be a form of secondary gain, you know, like
11 saying that if they have a ventilatory abnormality, that
12 it was from the coal dust rather than the cigarette
13 smoking, a situation like that.
14     Q   All right.  So, for instance, if Mr. Kochera
15 told his treating physicians, for instance, that he had
16 a 37-pack-year smoking history, and that he was still
17 smoking as of even, it would appear, 2006, 2007, that
18 would be completely different than the cigarette history
19 you obtained, which was essentially a half-pack-year
20 smoking history?
21     A   Yes, sir.  That's a significant difference.
22     Q   A significant difference in smoking when he was
23 17 to 18, half a pack a day, versus a 37-pack-year
24 history still smoking up to 2005, 2006?

Page 216

1      A   Yeah, that's a significant difference in
2  cigarette smoke exposure.
3      Q   Okay.  And you didn't do anything to
4  independently verify whether or not he was a current
5  smoker?
6      A   I didn't do anything.
7         MR. VINSON: Objection.
8  BY MR. LaBOON:
9      Q   Mr. Kochera also told you that while he worked
10 as a policeman and fireman, he was often exposed to
11 smoke?
12     A   Uh-huh.
13     Q   Is that correct?
14     A   Let's see.  Yeah, I'm sure -- if he was a
15 fireman, he may have been exposed to -- it's likely that
16 he was exposed to smoke.
17     Q   That's what he told you?
18     A   Yeah.
19     Q   He told you affirmatively and you put in the
20 report that he was exposed to smoke?
21     A   Let's see.  Did I?  Do I have it in the report?
22     Q   It's the next sentence after his smoking
23 history.
24     A   Okay.

Page 217

1      Q   Page two.
2      **A   He's been exposed to smoke, yeah.**
3      Q   Would you consider Mr. Kochera to be obese?
4      **A   Let's see, 72 inches, 209 pounds.  I wouldn't**
5  **think he'd be -- you would call him obese, significantly**
6  **obese.  He probably had a BMI of like 26 or 27,**
7  **something like that.**
8      Q   And, again, he -- he told you that some doctor
9  allegedly said he had asbestos-related pleural disease?
10     **A   Yes, sir.  He told me that.**
11     Q   Okay.  And, again, when you -- when you're
12 doing your B read did not see any evidence of any type
13 of pleural abnormality; is that correct?
14         MR. VINSON:  Objection.
15     **A   I didn't see it on the chest x-ray.  That's**
16 **correct.**
17 BY MR. LaBOON:
18     Q   Okay.  So when you looked at the chest x-ray
19 and then you were told this history, did you do anything
20 to attempt to reconcile the differences?
21     **A   No.**
22     Q   When you take a history -- you say you took a
23 general health history, correct?
24     **A   Yeah.  I asked him about pulmonary conditions.**

Page 218

1      Q   Okay.  If he had told you that he had coronary
2  artery disease or any type of cardiac catheterization
3  procedures or stent placements or anything like that,
4  would those have been reported in your report?
5      **A   No.**
6      Q   Why?
7      **A   Because it's not relevant to what I'm doing**
8  **here, evaluating for asbestosis.  That's for him and his**
9  **personal physician.  I don't -- I don't need to know**
10 **that.**
11     Q   And then the other -- looking back at your
12 B read report, you noted under "other symptoms" two
13 other symptoms; is that correct?  This is section 4B of
14 your report.
15     **A   Yes, sir.**
16     Q   Okay.  And what were the two other symptoms or
17 symbols that you checked off?
18     **A   He had some atherosclerotic changes in his**
19 **aorta, AA, the first one.**
20     Q   Yes.
21     **A   The other one, it looks like he's got**
22 **interlobar fissure thickening.**
23     Q   Have you requested any other documents
24 concerning Mr. Kochera?

Page 219

1      **A   No, sir.**
2      Q   Have you issued any bills or invoices to
3  plaintiffs' counsel for any of these cases?
4      **A   Yes, sir.**
5      Q   How did those get sent?
6      **A   A hand -- I hand-delivered them to him.**
7      Q   Have they been paid?
8      **A   I'm sure they have.  I can't tell right now.**
9      Q   Okay.  Do you have copies of those invoices on
10 your computer?
11     **A   No, not on this computer.**
12     Q   Okay.  And that would be true for all five
13 plaintiffs that we're discussing today?
14     **A   Yeah.  I don't have them on this computer.**
15         MR. LaBOON:  I think those are all the
16 questions I have for Mr. Kochera.
17         FURTHER DIRECT EXAMINATION
18 BY MR. SCHROER:
19     Q   Dr. Vuskovich, can you hear me?
20     **A   Yes, sir.**
21     Q   Okay.  My name is Mike Schroer, and I've just
22 got a few minutes of questions.  It shouldn't be very
23 long.
24         Just so the record is clear, you did not review

Page 220

1  any medical records in the Kochera case, correct?
2          MR. VINSON:  Objection, misstates prior
3  testimony, mischaracterization.
4      **A   I didn't review his medical records.**
5  BY MR. SCHROER:
6      Q   The only thing you looked at -- the only thing
7  you looked at was a chest x-ray, and then you also did
8  your interview; is that correct?
9      **A   Yes, sir.**
10     Q   Okay.  And you've not seen any discovery
11 responses from any defendants in the Kochera case,
12 correct?
13     **A   That's correct, sir.**
14     Q   And you've not read any transcripts of any
15 testimony of any representative of any defendant in the
16 Kochera case; is that correct?
17     **A   Yes, sir.**
18     Q   And you have not seen any documents that
19 pertain specifically to any defendant in the Kochera
20 case; is that correct?
21     **A   Yes, sir.  That's correct.**
22     Q   Do you remember where you met with Mr. Kochera
23 to do your examination in May of 2013?
24     **A   No, sir.**

Page 221

1    Q   Did Mr. Kochera's attorneys arrange for that
2  meeting?
3    A   Yes, sir.
4    Q   Did they pay you for that?
5    A   Yes, sir.
6        MR. VINSON:  Objection, asked and answered.
7  BY MR. SCHROER:
8    Q   How much did they pay you to do your
9  independent medical examination of Mr. Kochera?
10        MR. VINSON:  Same objection.
11    A   $300.
12  BY MR. SCHROER:
13    Q   Besides that meeting, have you ever talked to
14  Mr. Kochera on any other occasion?
15    A   No, sir.
16    Q   You don't know whether a fiber burden analysis
17  was done in Mr. Kochera's case, do you?
18    A   No, sir.
19    Q   And you don't know if there was tissue
20  available that would have allowed for a fiber burden
21  analysis, do you?
22    A   No, sir.
23    Q   I saw on your B read, there is a checklist of
24  variables at the bottom on the form?

Page 222

1    A   Yes, sir.
2    Q   And one's for bilateral plaques and pleural
3  thickening, and one is for bilateral parenchymal
4  changes, and one is for bilateral plaque and pleural
5  thickening.  Is that something that you added to the
6  form?
7    A   Yes, sir, I added it to the form.
8    Q   Okay.  The ILO form doesn't come with those
9  variables on them, do they?
10    A   No, sir.
11    Q   Okay.  Is that a form that you made kind of
12  specialized for use in asbestos cases?
13    A   Yes, sir.
14    Q   And you've not seen the hospital radiologist's
15  interpretation of the October 28th, 2010, film you
16  reviewed, have you?
17    A   No, sir.
18    Q   You gave Mr. Kochera -- you diagnosed him with
19  asbestosis with a perfusion of 2/1.  Is that something
20  that you would expect a hospital radiologist to --
21  strike that.
22        Isn't asbestosis with a 2/1 perfusion, would
23  that have features that you would expect a hospital
24  radiologist to note on an interpretation of a film?

Page 223

1        MR. VINSON:  Objection, foundation.
2    A   I would expect him to note that, but, you know,
3  I don't -- you know --
4  BY MR. SCHROER:
5    Q   Okay.  Would it surprise you to know that the
6  hospital radiologist did not interpret the October 28th,
7  2010, film to demonstrate any parenchymal opacities?
8        MR. VINSON:  Same objection.
9    A   It wouldn't surprise me.
10  BY MR. SCHROER:
11    Q   It wouldn't surprise you?
12    A   It would not surprise me that he didn't -- he
13  didn't mention that or didn't do that.
14    Q   Why would that not surprise you?
15    A   Well, he's interpreting the x-ray for clinical
16  purposes.  He's looking for pneumonia or cancer or
17  something else, you know.  He's not really looking for
18  small irregular opacities, and it's likely that he's not
19  a B reader, and he wasn't -- he wasn't tasked to provide
20  a B reader interpretation of the x-ray.
21        So as a clinical radiologist, you read hundreds
22  of x-rays every day.  So unless there's really severe
23  fibrosis or some severe changes, he's likely not going
24  to mention it.

Page 224

1        I mean, the treating physician ordered the
2  x-ray for some specific purpose here, and so he's going
3  to address that.  He's not going to address small
4  rounded opacities or small irregular opacities.
5    Q   Is it your testimony that the small irregular
6  opacities that you noted in the middle and lower lungs
7  bilaterally are not significant to Mr. Kochera's overall
8  health?
9    A   Yes.
10        MR. VINSON:  Objection, form.
11        THE WITNESS:  It is significant to his health.
12  BY MR. SCHROER:
13    Q   But you believe that the hospital radiologist
14  would have overlooked that condition even though you do
15  believe that it's significant to Mr. Kochera's health?
16        MR. VINSON:  Objection.
17    A   You know --
18        MR. VINSON:  Form.
19    A   -- I have no idea what he was thinking or what
20  he did.
21  BY MR. SCHROER:
22    Q   And without seeing any medical records, you
23  could not rule out the possibility that Mr. Kochera had
24  a history of idiopathic pulmonary fibrosis?

Page 225

```
 1              MR. VINSON:  Form.
 2    BY MR. SCHROER:
 3        Q    Correct?
 4        A    No, sir.
 5        Q    No, you did not rule that out?
 6              MR. VINSON:  Form.
 7        A    I had no information about that.
 8    BY MR. SCHROER:
 9        Q    Okay.  And, likewise, you did not rule out the
10    possibility that Mr. Kochera had hypersensitivity
11    pneumonitis, did you?
12              MR. VINSON:  Same objection.
13        A    No, sir, I had no information about that.
14    BY MR. SCHROER:
15        Q    Okay.  Not having any information, you were not
16    able to rule that out, correct?
17        A    That's correct.
18              MR. VINSON:  Form.
19    BY MR. SCHROER:
20        Q    And you were not able to rule out the
21    possibility that Mr. Kochera had a history of
22    sarcoidosis, are you?
23              MR. VINSON:  Form.
24        A    I didn't have any information about that.
```

Page 226

```
 1    BY MR. SCHROER:
 2        Q    Okay.  But you did not rule it out, did you?
 3        A    I did not -- I did not rule it out, because I
 4    don't have any information.
 5        Q    You didn't rule out the possibility that
 6    Mr. Kochera had a history of exposure to silica, did
 7    you?
 8              MR. VINSON:  Form.
 9        A    I don't know how to answer that yes or no.  I
10    mean, what should I say?  I don't have any information
11    about that.
12    BY MR. SCHROER:
13        Q    You did not ask Mr. Kochera if he was exposed
14    to silica when you had your independent examination of
15    him?
16              MR. VINSON:  Objection.
17        A    No, I -- I didn't have any information about
18    silica.
19    BY MR. SCHROER:
20        Q    Okay.  Did you ask him if he was ever exposed
21    to coal dust when you interviewed him?
22        A    No, sir.
23              MR. VINSON:  Objection.
24    BY MR. SCHROER:
```

Page 227

```
 1        Q    And you did not rule out the possibility that
 2    Mr. Kochera had idiopathic interstitial pneumonia, did
 3    you?
 4        A    No, sir.
 5        Q    And you didn't rule out, just generally
 6    speaking, the possibility that Mr. Kochera had any other
 7    kind of interstitial lung disease --
 8              MR. VINSON:  Form.
 9    BY MR. SCHROER:
10        Q    -- did you?
11        A    No, sir.  Oh, yes, sir.  I don't know -- ask
12    the question again.
13        Q    You didn't rule out the possibility -- setting
14    aside asbestosis because your opinions are expressed in
15    your report, you didn't rule out the possibility that
16    Mr. Kochera had any other kind of interstitial lung
17    disease, did you?
18              MR. VINSON:  Form.
19        A    No, sir.  I didn't have any information about
20    that.
21    BY MR. SCHROER:
22        Q    Okay.  Are you aware that Mr. Kochera had a
23    positive purified protein derivative test?
24        A    No, sir.
```

Page 228

```
 1        Q    That's a test for tuberculosis, right?
 2        A    That's a test for exposure to tuberculosis.
 3        Q    Tuberculosis can cause pulmonary fibrosis,
 4    can't it?
 5              MR. VINSON:  Objection.
 6        A    Not like we see in asbestosis.
 7    BY MR. SCHROER:
 8        Q    But it can cause pulmonary fibrosis, right?
 9              MR. VINSON:  Objection.
10        A    Yes, sir, in the upper lobes.
11    BY MR. SCHROER:
12        Q    And you did not rule out the possibility that
13    Mr. Kochera had a tuberculosis-related fibrosis, did
14    you?
15              MR. VINSON:  Objection.
16        A    No, sir.
17    BY MR. SCHROER:
18        Q    You didn't see indication of asbestos fibers
19    are found in Mr. Kochera's lung tissue, did you?
20              MR. VINSON:  Form.
21        A    No, sir.
22    BY MR. SCHROER:
23        Q    And you didn't see any information that
24    Mr. Kochera had an elevated asbestos lung fiber burden,
```

57  (Pages 225 to 228)

Page 229

1  did you?
2         MR. VINSON: Form.
3     A  No, sir.
4  BY MR. SCHROER:
5     Q  Your report says that you personally discussed
6  with Mr. Kochera his history of exposure to asbestos as
7  well as other potential pulmonary irritants and/or
8  toxins. What other irritants and toxins did you ask
9  Mr. Kochera about?
10    A  Well, let's see. He was a smoker. He was
11  exposed to fire. He was a policeman, and the most
12  important thing, you know, related to him, that
13  asbestos, a potent carcinogen. You know, I always
14  advised him to stick close to his doctor and keep up a
15  good screening program for cancer.
16    Q  Okay.
17    A  That's what I tell him.
18    Q  Besides smoke and asbestos, did you ask
19  Mr. Kochera if he was exposed to any other irritants and
20  toxins specifically?
21    A  I can't recall specifically. I don't know.
22  This is years ago. When did we do this? '13, that's
23  about a year and a half.
24    Q  And you did not perform a pulmonary function

Page 230

1  test on Mr. Kochera, did you?
2     A  No, sir.
3     Q  Your May 18, 2013, report, in the category for
4  lungs, notes "inspiratory bibasilar crackles and rhonchi
5  with no wheezing."
6     A  Yes, sir.
7     Q  Bibasilar crackles and rhonchi, those are
8  conditions that can be caused by things other than
9  asbestosis, correct?
10    A  Yes, sir.
11    Q  Okay. And you did not note that Mr. Kochera
12  had any clubbing of his extremities, correct?
13    A  That's correct.
14    Q  Your report is -- your longer report, the rule
15  26 report, is substantially similar to the last one we
16  discussed. Is it your opinion again that each and every
17  exposure Mr. Kochera had above background contributed to
18  the causation of asbestosis?
19    A  Yes, sir.
20    Q  And you didn't evaluate Mr. Kochera's exposure
21  separately for each defendant in this case, did you?
22         MR. VINSON: Objection, asked and answered.
23         It's down here.
24         THE WITNESS: Oh, okay.

Page 231

1         MR. VINSON: Kochera.
2  BY MR. SCHROER:
3     Q  You can answer the question, Doctor.
4     A  I -- would you repeat it? I had the wrong
5  chart.
6     Q  Sure. You didn't evaluate Mr. Kochera's
7  exposure separately for each defendant in this case, did
8  you?
9     A  No, sir.
10    Q  You considered the exposures collectively?
11    A  Yes, sir.
12    Q  Okay. And you didn't attempt to quantify his
13  cumulative exposure to asbestos from all sources in
14  terms of fiber years or any other measurement, did you?
15    A  No, sir.
16    Q  And you didn't --
17         MR. VINSON: Form.
18  BY MR. SCHROER:
19    Q  -- have to quantify exposure from any single
20  source or defendant in terms of fiber years; is that
21  right?
22    A  That's correct.
23         MR. VINSON: Form.
24  BY MR. SCHROER:

Page 232

1     Q  And you didn't analyze the regularity or
2  frequency with which Mr. Kochera was exposed to asbestos
3  from any defendants' products, did you?
4         MR. VINSON: Form.
5     A  What now? I didn't -- I didn't catch that
6  question.
7  BY MR. SCHROER:
8     Q  Sure. You did not analyze the regularity or
9  frequency with which Mr. Kochera was exposed to asbestos
10  or may have been exposed to asbestos from any individual
11  defendants' products? True?
12    A  That's true.
13    Q  And you have not relied on an industrial
14  hygienist report in this case; is that true?
15    A  That's true.
16    Q  And you haven't tried to determine whether any
17  of Mr. Kochera's exposures were above permissible
18  exposure limits or threshold limit values, have you?
19    A  That's true. I didn't do any type of
20  monitoring or anything.
21         MR. VINSON: Form.
22  BY MR. SCHROER:
23    Q  Similar to the question I asked you about lung
24  cancer, asbestos fibers have to remain in the lungs to

58  (Pages 229 to 232)

Page 233

1    cause fibrosis; is that true?
2        A   Yes, sir.
3        Q   Okay.  Asbestos fibers that are cleared by the
4    lungs don't contribute to fibrosis, do they?
5        A   No, sir.
6        MR. VINSON:  Asked and answered.
7    BY MR. SCHROER:
8        Q   And you don't know the sources of any asbestos
9    fibers that may have been retained in Mr. Kochera's
10   lungs and not cleared, do you?
11       A   I don't know, sir.
12       Q   If Mr. Kochera had longstanding coronary artery
13   disease with a myocardial infarction in 1993 and a stent
14   placement in 1999, would that be heart disease that
15   would significantly reduce his life expectancy?
16       A   Yes, sir.
17       Q   If he had dyslipidemia, would that
18   significantly reduce his life expectancy?
19       A   Yes, sir.
20       Q   Would a smoking history of 37 pack years
21   significantly reduce Mr. Kochera's life expectancy?
22       A   Yes, sir.
23       Q   If Mr. Kochera had gastritis with a GI bleed,
24   would that significantly reduce his life expectancy?

Page 234

1        A   If he has a GI bleed, I mean, it could kill him
2    acutely, but, I mean, just a history of having GI bleed
3    wouldn't reduce his life expectancy.
4        Q   If Mr. Kochera had hypotension, would that
5    significantly reduce his life expectancy?
6        A   Hypotension?
7        Q   Hypotension, not hypertension, but hypotension.
8        A   No, unless he was bleeding -- unless he was
9    bleeding to death.  That's a serious cause of
10   hypotension.  I mean, but that's an acute problem, you
11   know.
12       Q   What if he had hypertension, would that
13   significantly reduce his life expectancy?
14       A   Hypertension, yes, sir.
15       Q   And what if he had hypercholesterolemia, would
16   that significantly reduce his life expectancy?
17       A   It could if it goes untreated, you know, but
18   there's medication to treat that.
19       Q   Okay.
20       A   As well as medication to treat hypertension.
21   I'm sorry, as well as medication -- I don't know about
22   his treatment regimen.
23       MR. SCHROER:  Sure.  Nothing further at this
24   time, but thanks for your time, Dr. Vuskovich.

Page 235

1        THE WITNESS:  Thank you.  I'm going to go to
2    the men's room.
3        MR. LaBOON:  Okay.  We're taking a break.
4        (A recess was taken from 1:54 p.m. to
5    1:58 p.m.)
6        MR. LaBOON:  Does anybody else have any
7    questions for the doctor concerning Mr. Kochera?
8        MR. VINSON:  Hearing none --
9        MR. LaBOON:  Doctor, are you ready to continue?
10       MR. FERGUS:  I'm sorry, are we back from the
11   break yet?
12       MR. LaBOON:  Yeah.
13       MR. FERGUS:  I have a couple of quick questions
14   for the doctor.
15       MR. LaBOON:  All right.
16       MR. VINSON:  Still Kochera.
17       THE WITNESS:  Oh, we're still on Kochera?
18       MR. VINSON:  Uh-huh.
19       MR. LaBOON:  Go ahead.
20       MR. VINSON:  Which documents would you want to
21   ask him about, Sean, so we can get them open?
22       MR. FERGUS:  Just general questions.
23       MR. VINSON:  Okay.
24       FURTHER DIRECT EXAMINATION

Page 236

1    BY MR. FERGUS:
2        Q   Doctor, this is Sean Fergus again.
3        If an individual has asbestosis, you would
4    expect that disease to worsen and not improve; is that
5    correct?
6        A   It's hard to say.  Some people worsen, and some
7    people stay the same.
8        Q   But when you get asbestosis, you don't get
9    better, correct?
10       A   It doesn't resolve.  It shouldn't get better.
11       Q   And you would agree with me that an individual
12   who actually had asbestosis will show a gradual
13   progression of the disease?
14       A   Typically, they do, but often they don't.
15       Q   So if an individual has x-rays over the course
16   of several years, and those x-rays don't show any signs
17   of asbestosis, that would be inconsistent with a
18   diagnosis of asbestosis, correct?
19       MR. VINSON:  Objection, foundation.
20       A   That's not so.
21   BY MR. FERGUS:
22       Q   So you're saying that an individual with
23   asbestosis can spontaneously show radiographic signs of
24   asbestosis?

59  (Pages 233 to 236)

Page 241

```
1          MR. VINSON:  And B read.  Just give us one
2     second.
3          Right here.  Right above IME.
4          THE WITNESS:  Okay.
5          MR. VINSON:  Yeah, B read.
6          All right.  He's ready.
7     BY MR. LaBOON:
8          Q   Do you agree with this statement:  It is
9     essential to take a comprehensive occupational and
10    environmental history when asbestos-related disease is
11    suspected?
12         A   Yes, sir.
13         Q   Okay.  I take it then from our inventory in the
14    records that you have no pulmonary function test results
15    for Mr. Neureuther?
16         MR. VINSON:  Objection.
17         A   No, I didn't have any.
18    BY MR. LaBOON:
19         Q   You haven't reviewed any?
20         A   No, sir.
21         Q   Have you reviewed pulmonary function test
22    results for any of these five individuals?
23         A   No, sir.
24         Q   Okay.  So you met Mr. Neureuther apparently on
```

Page 242

```
1     February 4th of 2013?
2          A   Yes, sir.  I'll see -- is that when it is?
3     Let's see.  February 4th, 2013.
4          Q   Okay.  And you had previously reviewed an
5     11/20/2009 x-ray, and you did the review of that on
6     January 8th of 2013; is that correct?
7          A   Yes, sir.
8          Q   Do you recall where you met Mr. Neureuther?
9          A   Neureuther.
10         Q   Neureuther, sorry.  Neureuther.
11         A   You know, I think I met Mr. Neureuther in a
12    hotel conference room.
13         Q   Where?
14         A   At -- in Ybor City.  I think he was with his
15    family.  He's an older man.  He was born in 1930, so his
16    family accompanied him.  I think his sons were there
17    with him.
18         Q   Okay.
19         A   But I talked to him personally, yeah.
20         Q   So when you like, for instance, have his weight
21    and height, when you were in this conference room in the
22    hotel, did you bring --
23         A   No, that's self-reported.
24         Q   Okay.  Going through the report, he gave you an
```

Page 243

```
1     occupational history of exposure both as a custodian and
2     then in the U.S. Navy as a blower man, correct?
3          A   Yes, sir.
4          Q   And did you ask him about any other potential
5     dust exposures besides asbestos, as far as you can tell?
6          MR. VINSON:  Objection.
7          A   I don't have it documented here --
8     BY MR. LaBOON:
9          Q   Okay.
10         A   -- on this report.
11         Q   Okay.
12         A   But I asked him about his pulmonary history and
13    exposures, but it's not documented on this report.
14         Q   It says in the bottom page of your -- the
15    bottom of your report, "Mr. Neureuther submitted that
16    his physician diagnosed him with a pulmonary disease,
17    but he did not understand the specific diagnosis,"
18    correct?
19         A   Yes, sir.  That's what he told me.
20         Q   Did you try to explore that with him as to what
21    the disease was?
22         A   No, sir.
23         Q   Okay.  Well, he was there for an
24    asbestos-related exam, true?
```

Page 244

```
1          A   Yes, sir.
2          Q   Okay.  Did you ask him whether or not the
3     diagnosis was asbestosis?
4          MR. VINSON:  Objection.
5          A   I likely did, he didn't know.  I mean, the
6     man's old, and he didn't -- you know, he probably didn't
7     understand what his doctor said --
8     BY MR. LaBOON:
9          Q   Okay.
10         A   -- which I see that a lot, you know.
11         Q   I'm going to show you a couple of medical
12    records.  I'm going to show you first a medical record
13    that is dated 12/10/2009 from the Venice Regional
14    Medical Center in Venice, Florida.  Okay?
15         A   Uh-huh.
16         Q   And it says, "Medical history includes
17    hypertension, high cholesterol, asbestosis," and then
18    some other disease processes, correct?
19         A   Yeah.
20         Q   Is that a yes?
21         A   Uh-huh.
22         Q   Okay.  And when you read the history, it would
23    appear that this doctor, like yourself, saw
24    Mr. Neureuther in person --
```

Page 305

1    it says you examined him on May 9th, 2013, and then
2    there's another sentence, though, that says -- it has a
3    date of February 4th of 2013.  That's obviously a
4    mistake, correct?
5        A   Yeah, it was May 9th, 2013.
6        Q   Okay.  And this report, again, has a statement
7    that you have reviewed his deposition transcript and
8    discovered that that is not true, correct?
9            MR. VINSON:  Objection.
10       A   Yes, sir.
11   BY MR. LaBOON:
12       Q   And the report that you got from Mr. -- you
13   don't actually report a smoking -- I'm sorry, I will
14   retract that.  You did.
15           He smoked from age 17 and quit in 1988,
16   correct?
17       A   Yes, sir, two packs per day.
18       Q   Okay.  I take it that you have not seen any
19   records from UMC where he reported smoking three packs a
20   day for 30 years?
21       A   I didn't see those records.
22       Q   Mr. Greenleaf reported to you that he had been
23   diagnosed possibly with mesothelioma; is that correct?
24       A   That's what he told me.

Page 306

1        Q   Okay.  You have no information that he,
2    Mr. Greenleaf, has mesothelioma, correct?
3        A   No.
4        Q   Okay.  You're not diagnosing him with
5    mesothelioma?
6        A   No.
7        Q   He used supplemental oxygen and sleeps with a
8    CPAP?
9        A   Yes, sir.
10       Q   Do you believe that his use of supplemental
11   oxygen is related to his heavy cigarette smoking
12   history?
13           MR. VINSON:  Objection, form.
14       A   You know, I don't know.  I would have to see
15   his medical records to see why his doctor uses
16   supplemental oxygen therapy.
17           MR. LaBOON:  Okay.  I don't think I have any
18   other questions on Mr. Greenleaf.
19   BY MR. LaBOON:
20       Q   Have you understood the questions I've asked
21   you today?
22       A   Yes, sir.
23       Q   And if you didn't, did you ask me to rephrase
24   that, or did you say that you didn't understand it?

Page 307

1        A   I did, sir.
2        Q   Have I been polite?
3        A   Yes, sir.
4            MR. LaBOON:  Okay.  I will pass the witness at
5    this time.
6            FURTHER DIRECT EXAMINATION
7    BY MR. SCHROER:
8        Q   Dr. Vuskovich, just a few questions.  This is
9    Mike Schroer again.
10           Do you have any information about Greenleaf's
11   current state of health?
12       A   No, sir.
13       Q   Do you know whether there was a fiber burden
14   analysis done on this case?
15       A   No, sir.
16           MR. VINSON:  I thought we stipulated to these
17   questions, Counselor.
18           MR. SCHROER:  I don't know if we stipulated to
19   fiber burden, but --
20           MR. VINSON:  Yes, we did stipulate to burden,
21   dose.
22           MR. SCHROER:  I don't know if you did, but if
23   you let me ask two more, I think this will be --
24           MR. VINSON:  We'll stipulate no fiber burden

Page 308

1    analysis was done, just to reiterate.
2            TELEPHONIC DEFENSE COUNSEL:  In all five cases?
3            MR. VINSON:  Yes.
4            TELEPHONIC DEFENSE COUNSEL:  Thank you.
5    BY MR. SCHROER:
6        Q   Mr. Vuskovich, do you know whether there was
7    sufficient tissue for a fiber burden analysis in the
8    Greenleaf case?
9        A   No, sir, I have no -- no information regarding
10   that.
11       Q   Okay.  You included in your report that
12   Mr. Greenleaf had asbestosis.  Did you rule out the
13   possibility that he had any other conditions that could
14   have caused pulmonary fibrosis or interstitial lung
15   disease?
16           MR. VINSON:  Objection.
17       A   No, sir.
18   BY MR. SCHROER:
19       Q   Same as all the other cases, the only thing you
20   received in the nature of a medical record was one
21   x-ray; is that correct?
22       A   Yes, sir.  I just had his x-ray and not really
23   a medical record.  I had the x-ray and my personal
24   evaluation.